9 A.3d 1003

DAVID JOHNSON, PLAINTIFF–APPELLANT, v. MOLLY V.G.B. JOHNSON, DEFENDANT–RESPONDENT.

Argued September 28, 2010—Decided December 10, 2010.

530

*August J. Landi* argued the cause for appellant.

*Frank J. LaRocca* argued the cause for respondent (*LaRocca Hornik Rosen Greenberg & Blaha,* attorneys).

Justice LONG delivered the opinion of the Court.

Recently, in *Fawzy v. Fawzy*, 199 *N.J.* 456, 973 *A.*2d 347 (2009), we held that the constitutional guarantee of parental autonomy includes the right of parents to choose arbitration as the forum in which to resolve their disputes over child custody and parenting time. *Id.* at 461–62, 973 *A.*2d 347. In that case, we set forth the prerequisites for an enforceable arbitration agreement and the methodology by which an arbitration award in the child custody setting may be judicially reviewed. *Ibid.* In *Fawzy*, which was decided under New Jersey's version of the Uniform Arbitration Act (Arbitration Act), *N.J.S.A.* 2A:23B–1 to –32, we declared, in recognition of our *parens patriae* authority, that in addition to the remedies provided in the Arbitration Act, an arbitrator's award is subject to judicial review if a party establishes that the award threatens harm to a child. *Fawzy, supra,* 199 *N.J.* at 478–79, 973 *A.*2d 347. To ensure a basis on which to evaluate a claim of harm, we required that a record of all documentary evidence be kept; testimony be recorded verbatim; and that an award, including findings of fact and conclusions of law, issue. *Id.* at 480–81, 973 *A.*2d 347.

The case before us was not decided under the Arbitration Act, but under the New Jersey Alternative Procedure for Dispute Resolution Act (APDRA), *N.J.S.A.* 2A:23A–1 to –19, which conforms in many respects to the procedures we set forth in *Fawzy*. The trial judge ruled that the record was adequate for review and confirmed the arbitration award. However, because of the absence of a verbatim transcript, the Appellate Division reversed the trial judge's confirmation order and remanded the matter for a plenary hearing. *Johnson v. Johnson,* 411 *N.J.Super.* 161, 174–76, 984 *A.*2d 912 (App.Div.2009).

We now reverse. Although we agree with the Appellate Division that the principles established in *Fawzy* were intended to be

applicable across the board to all child custody arbitrations, we believe that the absence of a verbatim transcript was not fatal in this case. The purpose behind *Fawzy's* procedural safeguards was to assure a basis upon which meaningful judicial review of an arbitration award can occur in a case in which harm to a child is claimed. What *Fawzy* requires is the existence of an arbitration record against which the claim can be tested. That is so whether the arbitration is conducted under the Arbitration Act, APDRA, or under specific procedures agreed upon by the parties.

In this case, the arbitrator produced a complete record of all evidence he considered, a detailed recapitulation of every interview and observation he conducted, a full explanation of the underpinnings of the award, and a separate opinion on reconsideration. That satisfies the spirit of *Fawzy* and constitutes an acceptable substitute for a verbatim transcript.

## I.

The case arose as follows: David Johnson and Molly V.G.B. Johnson were married on October 26, 1994, and divorced on August 16, 2005. Two children were born during the marriage: Amelia, on February 9, 2001, and Elsie, on January 30, 2003. In May 2005, the couple separated; Ms. Johnson elected to move out of the marital home and ceded residential custody of the children to Mr. Johnson. From May 2005 until November 2005, Ms. Johnson spent parenting time at the marital residence while she lived in an apartment with roommates. When she purchased her current home, the children began to spend time with her there.

The final judgment of divorce incorporated a May 24, 2005, property settlement agreement, which provided that the parties would share joint legal custody of the children and that Mr. Johnson would continue as the residential custodial parent. According to the informal parenting schedule the parties agreed on, Mr. Johnson had the children from Sunday evening to Tuesday evening (5:30 p.m.); Wednesday evening to after school Thursday; and alternate weekends from Friday evening until Sunday eve-

ning. Ms. Johnson had the children from Tuesday evening until Wednesday evening (5:30 p.m.); Thursday after school until Friday evening (5:30 p.m.); and alternate weekends from Friday evening until Sunday evening. Holidays were alternated and each party had one week of vacation with the children per year.

Following the divorce, the parties encountered difficulties with the parenting schedule and thereafter consented to resolving those issues in arbitration. Pursuant to a consent order, the parties chose to be governed by the APDRA. Their agreement was extremely thorough and explained what the parties viewed as the issue and how they intended the APDRA to operate. The agreement began by identifying the issue:

1A] The parties are the parents of AMELIA JOHNSON, age six, and ELSIE JOHNSON age four. For several years [they] have experienced on-going difficulties in resolving differing parenting approaches and Parenting Time Schedules that will advance their children's best interests.

The agreement went on to detail the parties' expectations regarding how the case was to be conducted:

1B] To resolve parenting differences and Parenting Time scheduling issue[s] *in futuro*, the parties have agreed to utilize the Arbitration services of MARK WHITE, Ph.D. It is *not* the intent of the parties and recognized and acknowledged that Dr. WHITE shall not provide any therapeutic or other psychological services in this case; as serving in this dual role would place Dr. WHITE in a conflict situation. Rather it is envisaged that Dr. WHITE shall initially meet with the parties and counsel; and thereafter meet with both parties on one or more occasions as he shall deem necessary in his sole discretion. Dr. WHITE shall receive position papers of the parties which may be prepared with the assistance of and prepared by their attorneys. The position papers may include examples of the difficulties the parties have faced, citing examples, findings of facts that are requested to be made by Dr. WHITE, as well as [the] law of the State of New Jersey applicable to such facts. Dr. WHITE will observe the children in the presence of the parents. With this input and without the necessity of taking formal testimony of the parties in the presence of their attorneys, it is anticipated that Dr. WHITE will have sufficient information to craft a decision intend[ed] to resolve the parenting issues and scheduling issues that currently [exist]. It is not envisaged that Dr. WHITE will require formal Arbitration in the presence of both parties and counsel to make findings of fact in this case; although he shall have the power and authority to do so, in his sound discretion. It is required that Dr. WHITE create a scheduling calendar, with the intent of limiting future parenting schedule controversy to a minimum. The fact that testimony of the parties in each other's presence and counsel's presence was not adduced by the Arbitrator/Umpire shall not constitute a good cause grounds for reversing the Arbitration Award.

In addition, the agreement vested the arbitrator with the duty to make findings of relevant material facts and legal determinations; provided that the arbitrator would make an award on all submitted issues in accordance with applicable principles of New Jersey substantive law, as required by *N.J.S.A.* 2A:23A–12(e); afforded a right to file a motion for reconsideration of the award and for modification, pursuant to *N.J.S.A.* 2A:23A–12(d); limited the parties' right to appeal to the issue of whether the arbitrator properly applied the law to the factual findings and issues presented for resolution; and specified that there would be no transcript of proceedings and that the detailed findings of the arbitrator would constitute the record, as supplemented by the written certified statements submitted by the parties prior to arbitration. The agreement was explicit that testimony outside a party's or counsel's presence would not constitute good cause grounds for reversing any award. Finally, the parties waived their rights to a trial on the merits and preserved the right to appeal the award within the constraints of the APDRA.

As anticipated by the agreement, over the course of several months the arbitrator conducted various interviews, including those with Mr. Johnson (multiple), his new wife, Sara Johnson, Ms. Johnson (multiple), Amelia and Elsie, a psychologist (Dr. Sandra Sessa), and a clinical social worker (Ms. Cheryl Daniel) who had previously counseled the parties. In addition, he observed the children in both home settings and reviewed their school records.

In April 2008, the arbitrator issued his award. At the outset, he detailed the parties' proposals, which were not vastly different from what was in effect at the time:

Proposal of Mr. Johnson

The children would be at the home of Mr. Johnson Sunday night through Friday afternoon, and every other weekend. Alternation of parenting time during the two extended winter and spring breaks from school. Alternation of holidays. One week vacation with each parent. Sunday evening overnights with Ms. Johnson before all Monday holidays when the children are off from school. Children to be returned by noon Monday. Dinner with Ms. Johnson one night during the week, to be scheduled "based upon the best arrangement factoring everyone's schedule."

. . . .

Proposal of Ms. Johnson

The weekend the children are with Ms. Johnson should be extended to include Sunday overnights, and then drop off at schools Monday mornings. Scheduling of activities for the children only upon mutual consent of both parents. Pick up of the children from schools on Thursdays.

The arbitrator then recounted the substance of every interview and observation he undertook, including a particularized recitation of the parties' claims about their different approaches to parenting and the problems with scheduling transitions. Mr. Johnson, who remains angry at his former wife over the divorce, contended that she is unreliable and frequently late picking up the children; that she tends to drop the children off without remembering to bring their things; that the children are not dressed and ready when he picks them up or when their mother drops them off; that they are not ready for school on mornings after they stay with their mother; that they eat snacks at her house before dinner at his house; that Ms. Johnson creates emotionally dramatic transfers; that she is routinely five to ten minutes late; that she is more than ten minutes late almost twenty percent of the time; and that she has issues with boundaries (for example, she allows the girls to sleep with her) that cause problems in his home. The interview with Mr. Johnson's new wife, Sara Johnson, supported Mr. Johnson's claims regarding Ms. Johnson's unreliability.

Ms. Johnson countered that her former husband is rigid; has excessive control over the children's schedules; arranges activities during her parenting time; and that he has otherwise decreased the amount of time the children spend with her. She further claimed that he over schedules the children (e.g., dance, violin, swimming, T-ball, soccer), and that there is poor communication between the parties in that Mr. Johnson fails to convey essential information to her and verbally attacks her when the subject of increased parenting time comes up.

Ms. Johnson also contended that she had made the children late only a few times in two years; that the children benefit from the less structured, more creative environment at her home; that Mr.

Johnson does not give her open phone access to the children; and that he does not consult her on scheduled activities. Following that interview, Ms. Johnson sent the arbitrator a long letter reiterating all of her concerns, in particular, that her former husband's actions have the effect of "marginalizing" her. The arbitrator recounted the contents of the letter in his decision.

The home visits, according to the arbitrator, were uneventful—with both homes, though very different, fully appropriate for the girls. The arbitrator perceived the girls as well-adjusted, but affected by the parenting conflicts and the amount of moving around required.

The arbitrator reported Dr. Sessa's conclusion that the parties are opposite in nature, Ms. Johnson—"artsy, come-a-day, go-a-day"—and Mr. Johnson—"structured, highly organized, logical and linear." Yet, the psychologist expressed that she had no concern about either party's parenting abilities, though Ms. Johnson's organization could be improved upon. The psychologist did note significant animosity between the parties.

The arbitrator also detailed the results of his consultation with Ms. Daniel who had seen the parties several times in 2006. Like the psychologist, she noted the obvious stylistic differences between the parties and Mr. Johnson's continuing emotional response to the divorce. Despite Mr. Johnson's efforts to the contrary, she likewise found no basis to question Ms. Johnson's parental capacity. The arbitrator recapitulated the children's scholastic records from the 2007–2008 school year, which revealed that Amelia was tardy on six days, all of which followed overnights with her mother.

The arbitrator concluded that both parties are decent, well-intentioned, non-pathological parents and that the children are positively developing in their care. He proceeded to evaluate the case in terms of how the parties' behavior imposed on their daughters' experiences. He noted that it was his "fervent hope" that his involvement would "result in the prevention of escalation of the family system factors that could elevate the probability of

[the girls] developing psychological symptoms later in their childhoods."

To accomplish that goal, the arbitrator stated that Ms. Johnson needed to accept responsibility for leaving the marriage and for her lackadaisical approach, evidenced by her tardiness and inefficiency which prevented a "more robust co-parenting alliance," and that Mr. Johnson needed to confront and resolve his anger towards Ms. Johnson over the divorce. In addition, the arbitrator reasoned that the children were too young to experience so many transitions, particularly in light of the "intrinsic tension" between their parents and the "dissimilarity of the home cultures." Accordingly, he set forth a decision "[i]n the hope that both parties will accept [the provisions] in the child-protective spirit in which they are offered."

With a view toward carrying out what the parties had commissioned him to do—"create a scheduling calendar, with the intent of limiting future parenting schedule controversy to a minimum," the arbitrator increased the amount of uninterrupted weekly time the children spent with Mr. Johnson, but extended the weekend and holiday time spent with Ms. Johnson. Specifically, the arbitrator expanded Ms. Johnson's weekends with the children to Sunday overnights and limited her weekday overnights to Wednesdays only. He compensated for the time that the girls lost with their mother by providing her with a majority of three-day, four-overnight weekends and additional time during school vacations.

In addition, he referred Ms. Johnson to a neuropsychologist for an evaluation for Attention Deficit Hyperactivity Disorder based upon her "time management and attentional difficulties." He also referred Mr. Johnson to counseling for his unresolved emotions related to the divorce. Specifically addressing Ms. Johnson's concern that the children were overly programmed, the arbitrator limited them to one scheduled activity in a given season.

The award left open Ms. Johnson's request for expanded time with the children to be reconsidered after she had undergone her evaluation and demonstrated that Amelia could attend school for

three consecutive months without receiving a tardy notice. The decision also permitted future meetings between the arbitrator and the parties starting around October 1, 2008, to consider further modifications.

Ms. Johnson filed a motion for reconsideration of the entire decision or clarification of the extent of her vacation time custody. The gravamen of the motion was that she did not "feel as though [her] viewpoints and concerns were considered...." In response, the arbitrator prepared an eleven-point decision in which he reaffirmed his conclusion that both parents are well-intentioned and deeply invested in their children's welfare. He noted that he considered the extent and severity of both parties' accusations in a neutral fashion, and recounted Ms. Johnson's basic allegation that Mr. Johnson is overly controlling and Mr. Johnson's counter-allegation that Ms. Johnson is unreliable. He pointed to his recommendation that Mr. Johnson seek psychotherapy and that Ms. Johnson submit to a neuropsychological evaluation because of the empirical data that Amelia's six tardies in first grade occurred after nights she spent with her mother.

The arbitrator explained that changes in the schedule were based on the children's needs rather than any conclusion about Ms. Johnson's ability to parent. It was his explicit intention "to prevent the post-divorce version of the Johnsons' inability to collaboratively solve problems from metastasizing to a level that will represent a pathogenic risk to their beautiful daughters." The arbitrator stated that divorce and remarriage "necessitates the need to more clearly establish boundaries between Mom's house and Dad's house."

As an addendum to the decision, the arbitrator delayed implementation of the new schedule from the original decision because "stresses attendant to changing Amelia's schedule so late in the school year" outweighed the benefits of implementation. The arbitrator remained open to meeting with the parents prior to the start of the next school year to rebalance the children's time at each home and determine the advisability of a parent coordinator.

He observed that the "ultimate goal ... was to foster good faith in their post-divorce parenting alliance. Otherwise, a more adversarial and conflict-enhancing option would have been selected for resolution of their custody/visitation issues." He noted that such a climate of cooperation would be of immeasurable value to the girls' psychological development.

In July 2008, Ms. Johnson sought the arbitrator's removal based on the Appellate Division's decision in *Fawzy v. Fawzy*, 400 *N.J.Super.* 567, 948 *A.*2d 709 (App.Div.2008), which had held that parties cannot agree to binding arbitration in a custody matter. *Id.* at 571–72, 948 *A.*2d 709. In response, Mr. Johnson filed a motion to confirm the arbitrator's decision. Ms. Johnson filed a cross-motion requesting modification of the parenting time schedule or a plenary hearing to determine custody and parenting time.

Judge Robert A. Coogan presided over the proceedings in the Family Division. After a hearing, he confirmed the arbitrator's award. In ruling, the judge examined the award in terms of the children's interests and characterized both parties as "good parents." Because he determined that the girls "have a difficult time transitioning from one house to another," the judge faulted the prior custody schedule with its frequent shuttling back and forth several times during the week and concluded that it was reasonable for the arbitrator to extend Ms. Johnson's weekends and expand Mr. Johnson's weekday overnights. Further, he noted that the arbitrator was evenhanded in recommending that Ms. Johnson see a neuropsychologist specializing in Attention Deficit Hyperactivity Disorder and that Mr. Johnson attend counseling to address his unresolved anger. Finally, the judge concluded that there was a sufficient record made by the arbitrator to permit judicial review. Therefore, he denied Ms. Johnson's parenting schedule proposal and both parties' counsel fee requests and confirmed the arbitrator's award.

Ms. Johnson appealed. Meanwhile, we issued our opinion in *Fawzy.* Based on *Fawzy*, the appellate panel reversed the trial court decision and remanded the case for a plenary hearing

because the procedural requirements set forth in *Fawzy* were not satisfied. *Johnson, supra,* 411 *N.J.Super.* at 175, 984 *A.*2d 912. In particular, because there was no verbatim record of testimony, the panel concluded that the trial court had no basis on which to evaluate the threat of harm to the children or confirm the award. *Ibid.* The panel determined that this case was not distinguishable from *Fawzy,* which involved the Arbitration Act, and not the APDRA, because the acts "are similar" and "neither is immune to public policy concerns." *Ibid.* We granted Mr. Johnson's petition for certification. *Johnson v. Johnson,* 202 *N.J.* 43, 994 *A.*2d 1039 (2010).

## II.

The parties differ essentially over the applicability of *Fawzy* to this APDRA arbitration; over whether, if applicable, *Fawzy* requires reversal on the basis of the absence of a verbatim transcript; and over whether Ms. Johnson's claims of harm were sufficient to trigger substantive judicial review.

We begin with a recap of *Fawzy.* On the day that their divorce trial was to occur, the Fawzys agreed to binding arbitration and selected the recently-appointed guardian ad litem to serve as the arbitrator on all issues. *Fawzy, supra,* 199 *N.J.* at 462–63, 973 *A.*2d 347. In the parties' interim arbitration order, they agreed to be governed by the Arbitration Act. *Id.* at 465, 973 *A.*2d 347.

Between the time that the arbitration proceedings began and the taking of testimony, Mr. Fawzy filed an order to show cause seeking to restrain the arbitrator from deciding any parenting-time or custody issues on the grounds that our prior decision in *Faherty v. Faherty,* 97 *N.J.* 99, 477 *A.*2d 1257 (1984), precluded arbitration of such issues. *Fawzy, supra,* 199 *N.J.* at 465, 973 *A.*2d 347. He further claimed that he had been rushed into agreeing to arbitrate, and had done so because he believed he would be viewed as uncooperative otherwise. *Ibid.* The judge denied the application. Thereafter, the arbitrator awarded the parties joint legal custody and designated Mrs. Fawzy as the

primary residential parent. *Id.* at 466, 973 *A.*2d 347. Mr. Fawzy filed a second order to show cause, arguing that he did not understand the rights he was waiving when he agreed to arbitrate. *Ibid.* The trial judge denied that application and confirmed the award. *Ibid.*

Mr. Fawzy appealed, arguing that permitting parties to submit custody issues to binding arbitration deprives the court of exercising its *parens patriae* jurisdiction to protect children's best interests. *Ibid.* The Appellate Division agreed, reversed the trial court's ruling, and remanded the case for a plenary hearing on the custody and parenting-time issues. *Ibid.* On certification, we affirmed that judgment, although on different grounds. *Id.* at 485, 973 *A.*2d 347.

In *Fawzy* we recognized the benefits of arbitration in the family law setting and, in particular, the potential to "minimize the harmful effects of divorce litigation on both children and parents." *Id.* at 472, 973 *A.*2d 347. We further noted the wide-ranging scholarly support for such arbitration that had developed since the issue was left open in *Faherty.* *Id.* at 471–72, 973 *A.*2d 347.

In ruling, we reaffirmed the constitutional right to parental autonomy in child-rearing:

Deference to parental autonomy means that the State does not second-guess parental decision making or interfere with the shared opinion of parents regarding how a child should be raised. Nor does it impose its own notion of a child's best interests on a family. Rather, the State permits to stand unchallenged parental judgments that it might not have made or that could be characterized as unwise. That is because parental autonomy includes the "freedom to decide wrongly." [*Id.* at 473–74, 973 *A.*2d 347.]

At the same time, we recognized that "[t]he right of parents to the care and custody of their children is not absolute," *id.* at 474, 973 *A.*2d 347 (quoting *V.C. v. M.J.B.,* 163 *N.J.* 200, 218, 748 *A.*2d 539 (2000)), and that "the state has an obligation, under the *parens patriae* doctrine, to intervene where it is necessary to prevent harm to a child." *Id.* at 474–75, 973 *A.*2d 347 (footnote omitted). As we said in *Moriarty v. Bradt,* 177 *N.J.* 84, 827 *A.*2d 203 (2003), "interference with parental autonomy will be tolerated only to

avoid harm to the health or welfare of a child." *Id.* at 115, 827 A.2d 203. Indeed, that harm standard "is a constitutional necessity because a parent's right to family privacy and autonomy are at issue." *Id.* at 118, 827 A.2d 203. In short, potential harm to a child is the constitutional imperative that allows the State to intervene into the otherwise private and protected realm of parent-child relations. With that as a backdrop, we concluded that

> the bundle of rights that the notion of parental autonomy sweeps in includes the right to decide how issues of custody and parenting time will be resolved. Indeed, we have no hesitation in concluding that, just as parents "choose" to decide issues of custody and parenting time among themselves without court intervention, they may opt to sidestep the judicial process and submit their dispute to an arbitrator whom they have chosen.
>
> [*Fawzy, supra,* 199 *N.J.* at 477, 973 *A.*2d 347.]

We then turned to the standard of review of a child custody arbitration award and concluded that

> where no harm to the child is threatened, there is no justification for the infringement on the parents' choice to be bound by the arbitrator's decision. In the absence of a claim of harm, the parties are limited to the remedies provided in the Arbitration Act. On the contrary, where harm is claimed and a prima facie case advanced, the court must determine the harm issue. If no finding of harm ensues, the award will only be subject to review under the Arbitration Act standard. If there is a finding of harm, the presumption in favor of the parents' choice of arbitration will be overcome and it will fall to the court to decide what is in the child's best interests.
>
> [*Id.* at 478–79, 973 A.2d 347 (citation omitted).]

However, we expressed concern in *Fawzy* over the court's ability to intervene, where necessary, to prevent harm to the child,

> in light of the fact that the Arbitration Act does not require a full record to be kept of arbitration proceedings. Nor does it compel the recordation of testimony or a statement by the arbitrator of his findings and conclusions beyond the issuance of an award, *N.J.S.A.* 2A:23B–19(a), although parties are free to agree upon other procedures, *see N.J.S.A.* 2A:23B–4.
>
> [*Id.* at 480, 973 A.2d 347.]

Because of that, and because we determined that an empty record, like the one before us in *Fawzy,* could provide no basis for a harm review, we said:

> We therefore direct that when parties in a dissolution proceeding agree to arbitrate their dispute, the general rules governing the conduct of arbitration shall apply, *N.J.S.A.* 2A:23B–1 to –32. However, in respect of child-custody and parenting-

time issues only, a record of all documentary evidence shall be kept; all testimony shall be recorded verbatim; and the arbitrator shall state in writing or otherwise record his or her findings of fact and conclusions of law with a focus on the best-interests standard. It is only upon such a record that an evaluation of the threat of harm can take place without an entirely new trial. Any arbitration award regarding child-custody and parenting-time issues that results from procedures other than those that we have mandated will be subject to vacation upon motion. [*Id.* at 480–81, 973 *A.*2d 347.]

We then set forth the minimum elements of an agreement to arbitrate a child custody dispute, including that it

must be in writing or recorded in accordance with the requirements of *N.J.S.A.* 2A:23B–1. In addition, it must state in clear and unmistakable language: (1) that the parties understand their entitlement to a judicial adjudication of their dispute and are willing to waive that right; (2) that the parties are aware of the limited circumstances under which a challenge to the arbitration award may be advanced and agree to those limitations; (3) that the parties have had sufficient time to consider the implications of their decision to arbitrate; and (4) that the parties have entered into the arbitration agreement freely and voluntarily, after due consideration of the consequences of doing so.

[*Id.* at 482, 973 *A.*2d 347.]

Because the record in *Fawzy* was inadequate to assure that the parties fully understood the consequences of removing their custody dispute from the judicial arena into binding arbitration, we affirmed the decision of the appellate panel that had reversed the arbitration award and remanded for a new trial. *Id.* at 483, 485, 973 *A.*2d 347.

As a matter of practice, *Fawzy* plays out this way: When a child custody or parenting time arbitration award issues, one party will ordinarily move for confirmation. If there is no challenge, the award will be confirmed. If there is a challenge that does not implicate harm to the child, the award is subject to review under the limited standards in the relevant arbitration statute or as agreed by the parties. If a party advances the claim that the arbitration award will harm the child, the trial judge must determine whether a prima facie case has been established. In other words, is there evidence which if not controverted, would prove harm? If that question is answered in the negative, for example, where a claim of harm is insubstantial or frivolous (e.g., not enough summer vacation), the only review available will be

that provided in the relevant arbitration act or as otherwise agreed. If, on the other hand, the claim is one that, if proved, would implicate harm to the child, the judge must determine if the arbitration record is an adequate basis for review. If it is, the judge will evaluate the harm claim and, if there is a finding of harm, the parents' choice of arbitration will be overcome and it will fall to the judge to decide what is in the children's best interests. If the arbitration record is insufficient, the judge will be required to conduct a plenary hearing. That is the backdrop for our inquiry.

## III.

██ We turn first to Mr. Johnson's contention that *Fawzy* was intended to apply to Arbitration Act proceedings and not those conducted under APDRA, a notion with which we disagree. To be sure, there are differences between the Acts. The Arbitration Act does not require any particular procedures, mandate discovery, compel the maintenance of a record, command a statement by the arbitrator regarding his findings and conclusions, or an expression of the reasons why he reached the result that he did. *See N.J.S.A.* 2A:23B–1 to –32.

The APDRA differs from the Arbitration Act in that it is designed to balance "streamlined procedures necessary for efficient repose" with "substantive safeguards necessary to protect public rights." John V. O'Hara, Note, *The New Jersey Alternative Procedure for Dispute Resolution Act: Vanguard of a "Better Way"?*, 136 U. Pa. L.Rev. 1723, 1751 (1988). To that end, the APDRA includes procedures for factual development through discovery, *N.J.S.A.* 2A:23A–10, –11(e), the taking of expert witness testimony, *N.J.S.A.* 2A:23A–11(f), the submission by the arbitrator of a written opinion stating findings of fact and conclusions of law, *N.J.S.A.* 2A:23A–12(a), and requires that awards be in accordance with applicable legal principles, *N.J.S.A.* 2A:23A–12 (e), –13(c)(5), –13(e)(4).

Despite those differences, we are in agreement with the Appellate Division that the procedures we put in place in *Fawzy* to assure an adequate record against which to test a child custody arbitration award are applicable to all child custody arbitrations, whether conducted under the Arbitration Act, APDRA, or some other agreed-upon methodology. As we have said, the parents' constitutional right to decide how to resolve their child-rearing disputes must give way to our constitutional duty to protect children from harm. Thus, where a prima facie claim of harm is advanced, our substantive review is compelled. That review can only take place on a full record. That is the principle of *Fawzy* and it is applicable regardless of the statute under which the arbitration is conducted. The issue is the existence of a record that is sufficient to permit judicial review.

Because there was no record whatsoever in *Fawzy*, no review could take place. That is not the case here. Here, the arbitrator did exactly what was anticipated by the parties and, in accordance with the provisions of the APDRA, created a full record of what transpired. In crafting his award, he gave a complete recitation of what the parties told him and what he heard and saw during his observations. His opinions, both on the original award and on reconsideration, were painstakingly detailed and, like the trial judge, we have absolutely no reservation in declaring the record he created as adequate to review the arbitration award.

In the final analysis, whether an arbitration is conducted under the Arbitration Act or APDRA is not the issue of consequence. What matters is the state of the record. Obviously, a verbatim transcript of a trial-type hearing will satisfy *Fawzy*, assuming the other requirements of that case are met. However, where, as here, the arbitrator creates a detailed record for review, the award can be confirmed without verbatim transcription. It goes without saying that it would behoove any arbitrator tasked with resolving a child custody or parenting-time issue to prepare a record, at least as detailed as the one we have approved today. Such

preparation will avoid a judicial replay of the entire matter in the event of a substantial claim of harm.

## IV.

 We turn, finally, to Mr. Johnson's contention that Ms. Johnson's claim of harm was insufficient to tee up the issue of entitlement to judicial review. We agree. For that conclusion, we hearken back to our directive in *Fawzy:*

> Mere disagreement with the arbitrator's decision obviously will not satisfy the harm standard. The threat of harm is a significantly higher burden than a best-interests analysis. Although each case is unique and fact intensive, by way of example, in a case of two fit parents, a party's challenge to an arbitrator's custody award because she would be "better" is not a claim of harm. Nor will the contention that a particular parenting-time schedule did not include enough summer vacation time be sufficient to pass muster. To the contrary, a party's claim that the arbitrator granted custody to a parent with serious substance abuse issues or a debilitating mental illness could raise the specter of harm. Obviously, evidential support establishing a prima facie case of harm will be required in order to trigger a hearing. Where the hearing yields a finding of harm, the court must set aside the arbitration award and decide the case anew, using the best-interests test.
> [*Fawzy, supra,* 199 *N.J.* at 479, 973 *A.2d* 347.]

Here, neither party raised any real claim of unfitness. They agreed that there was "a lot of love in both homes and consistency between the homes in parenting, relative to a sense of respect, the importance of getting work done and manners." The issue was always parenting style, not capacity, and the arbitrator's commission was to create a schedule that would minimize conflicts and problems in the face of such different parenting styles. His new schedule was nothing more than a tweaking of an agreed-upon parenting time schedule to minimize disruption for the children. Simply put, that does not begin to approach a showing of harm sufficient to warrant judicial inquiry beyond what is provided in the APDRA.

## V.

One final note. Our holding that Ms. Johnson's contentions fell short of triggering a substantive judicial review of the arbitration award is without prejudice to her pursuing an application for

expanded parenting time as anticipated in the arbitrator's award. Much has transpired since the award issued in April 2008. The girls are growing up and how the parties have fared with the parenting time schedule during the interim period should be factored into any revised award. Either party may request such reconsideration.

## VI.

For the foregoing reasons, the judgment of the Appellate Division is reversed and the order of the trial judge confirming the arbitration award is reinstated.

Chief Justice RABNER, concurring.

In *Henry v. New Jersey Department of Human Services*, 204 *N.J.* 320, 9 *A.*3d 882 (2010), also decided today, the Court addressed the meaning and history of the Temporary Assignment clause of the New Jersey Constitution. *See N.J. Const.* art. VI, § 2, ¶ 1. The Court determined that the temporary appointment of the Honorable Edwin H. Stern, P.J.A.D., to the Supreme Court was constitutional. *Henry, supra,* 204 *N.J.* at 341, 9 *A.*3d 895 (Rabner, C.J., concurring).

As often occurs, an Associate Justice expressed a view that differed from the majority of the Court. Although he may continue to believe that the issue considered in *Henry* should have been decided differently, the constitutional question is now settled.

Our colleague has nonetheless abstained from voting in this case for the reasons he expressed in *Henry.* It is one thing to dissent from an opinion of the majority; it is another to refuse to participate—to vote—in matters before the Court. Under our system of law, holding a contrary view about a settled legal issue is not a basis for abstaining.

Respect for precedent is one reason that weighs against abstaining. Only months ago, in *Flomerfelt v. Cardiello,* two Justices concurred in a judgment of the Court because it was consistent

with an earlier, controlling decision. 202 *N.J.* 432, 458, 997 *A.*2d 991 (2010) (LaVecchia & Rivera–Soto, JJ., concurring) (citing *The Salem Group v. Oliver*, 128 *N.J.* 1, 607 *A.*2d 138 (1992)). They did so even though they believed a different outcome, as expressed by the dissent in the prior case, *Salem Group*, was preferable. *Flomerfelt, supra*, 202 *N.J.* at 462, 997 *A.*2d 991. They elegantly explained their concurring vote as follows: "although [we] do not embrace the reasoning espoused by the majority in *Salem Group*, it nevertheless remains precedent deserving of respect. That respect for stare decisis is the simple, and sole, reason for [our] concurrence in the judgment reached today." *Id.* at 463, 997 *A.*2d 991.

Stare decisis "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact." *Vasquez v. Hillery*, 474 *U.S.* 254, 265–66, 106 *S.Ct.* 617, 624–25, 88 *L.Ed.*2d 598, 610 (1986). Notwithstanding that deep-seated principle, our abstaining colleague declines to vote now because he has a different belief about the Temporary Assignment clause. By abstaining, he ignores settled precedent and discards stare decisis.[1]

---

[1] The abstaining opinion suggests that the issue of temporary assignments "was largely resolved by December 2007." *Post* at 558, 9 *A.*3d at 1020 (Rivera–Soto, J., abstaining). For support, he relies on an internal memorandum from the Clerk of the Court to the Supreme Court, which referenced ongoing, internal discussions about the court rule for temporary assignments, but was never adopted.

It is a departure from this Court's practice to cite to internal memos in opinions—or to cite them out of context in a way that alters their meaning. Courts do not enact rule changes or resolve constitutional issues through internal memos, and memos from the Clerk cannot substitute for precedential court rulings. Beyond that, the particular memo the abstaining opinion cites did *not*, in fact, resolve the issue. At a later conference, the full Court did not adopt the proposals under consideration or offer any rule changes for public comment because a majority, both then and now, did not consider a quorum-only rule proper for individual cases or lengthier assignments. (Moreover, the circum-

Of equal importance, a justice has a fundamental duty to participate to the fullest extent possible in all matters presented to the Court. As then-Justice Rehnquist observed in a memorandum opinion in *Laird v. Tatum,* 409 *U.S.* 824, 837, 93 *S.Ct.* 7, 15, 34 *L.Ed.*2d 50, 60 (1972), a "judge has a duty to *sit* where *not disqualified* which is equally as strong as the duty to *not sit* where *disqualified." Ibid.* (citations omitted) (emphasis in original); *see also United States v. Snyder,* 235 *F.*3d 42, 46 n. 1 (1st Cir.2000) (noting continued viability of *Laird's* "duty to sit" doctrine after statutory amendment).

Other states have also recognized the duty to sit. *See State v. Hernandez,* 115 N.M. 6, 846 P.2d 312, 326 (1993); *Tennant v. Marion Health Care Found.,* 194 *W.Va.* 97, 459 *S.E.*2d 374, 385 (1995); *see also United States Term Limits v. Hill,* 315 *Ark.* 685, 870 *S.W.*2d 383, 384–85 (1994) (Dudley, J.); *Peterson v. Borst,* 784 *N.E.*2d 934, 935 (Ind.2003) (Boehm, J.); *State v. Henley,* 322 *Wis.*2d 1, 778 *N.W.*2d 853, 862 (2009) (Roggensack, J.). This Court, likewise, has warned that it is improper for judges to err on the side of caution and recuse themselves unless there is a true basis that requires disqualification. *State v. Marshall,* 148 *N.J.* 89, 276, 690 *A.*2d 1 (1997).

Conflicts in individual cases may of course warrant recusal or disqualification. *See, e.g., Code of Judicial Conduct,* Canon 3(C)(1) ("A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned...."); *R.* 1:12–1(f) (instructing judges not to sit in any matter "when there is any ... reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so"). Absent such a reason, though, judges have an obligation both to hear and vote on cases. Judges are appointed to render decisions—not to sit on the sidelines.

---

stances that exist now were not contemplated by the Court in 2007.) Thus, the existing court rule, *R.* 2:13–2(a), remained in place.

Nowhere in the ethics rules or prior case law is there support for the notion that a judge may abstain or recuse from voting because his or her view has not prevailed on the merits of a legal question.[2, 3] The reason for that is straightforward: no judge is a law unto himself or herself. Every person—even members of this Court—must accept the rule of law. If a member of this Court is unwilling to abide by the judgment of the majority, what message does that send to others who may respectfully disagree with a particular decision?

Important, practical consequences flow from those precepts. Judges have a duty to uphold statutes that have been found to be constitutional even if, as legislators or individuals, they would have voted against the laws. *Cf. Masse v. Pub. Employees' Ret. Sys.,* 87 *N.J.* 252, 264, 432 *A.*2d 1339 (1981) ("It is not a judge's function to read into a statute what the legislators ought to have agreed

---

[2] Nor is there any justification for participating in oral argument yet not voting.

[3] In support of his position, our abstaining colleague cites to Justice Blackmun's views in death penalty cases. *Post* at 561, 9 *A.*3d at 1022 (Rivera–Soto, J., abstaining). Six months before retiring from the U.S. Supreme Court, Justice Blackmun dissented from the denial of a death row inmate's petition for a writ of certiorari. *Callins v. Collins,* 510 *U.S.* 1141, 114 *S.Ct.* 1127, 127 *L.Ed.*2d 435 (1994). He wrote that "no sentence of death may be constitutionally imposed under our death penalty scheme." *Id.* at 1146 n. 2, 114 *S.Ct.* at 1130 n. 2, 127 *L.Ed.*2d at 439 n. 2. During the following six months, he dissented from denials of stay motions, certiorari petitions, and petitions for rehearing in more than 150 cases filed by death row inmates.

Notably, Justice Blackmun did not abstain from voting in those cases. He also continued to participate fully in death penalty cases the Court considered. *See Tuilaepa v. California,* 512 *U.S.* 967, 984, 114 *S.Ct.* 2630, 2641, 129 *L.Ed.*2d 750, 767 (1994) (Blackmun, J., dissenting) (citing *Callins* and also addressing merits); *Romano v. Oklahoma,* 512 *U.S.* 1, 15, 114 *S.Ct.* 2004, 2013, 129 *L.Ed.*2d 1, 15 (1994) (Blackmun, J., dissenting) (joining Justice Ginsburg's dissent and separately citing *Callins* ); *Victor v. Nebraska,* 511 *U.S.* 1, 28, 114 *S.Ct.* 1239, 1254, 127 *L.Ed.*2d 583, 604 (1994) (Blackmun, J., concurring in part and dissenting in part) (addressing merits and citing *Callins* ).

Justice Blackmun's approach, thus, does not provide a basis for judges to abstain from voting.

upon if they had possessed his wisdom and courage.... [C]ourts should adhere to the legislation as written.") In other words, judges may not abstain from applying laws they disagree with.

Judges have the same obligation regarding provisions in the State Constitution. They are obliged to uphold and abide by constitutional practices despite differing personal views.

Those concepts are fundamental to the rule of law. In an ordered society, citizens are entitled to rely on the words in the Constitution, statutory codes, and reported decisions. Judges, in turn, must accept and apply settled principles of law. Although precedent may be overturned when appropriate, a judge's participation in the interim is not optional.

One additional reason counsels against continued abstention: our abstaining colleague's considered views as a voting Justice are worthy of consideration by fellow members of this Court and the litigants who appear before it. For all of those reasons, he should fully participate in this matter and all others presented for the Court's review.

JUSTICES LONG, LaVECCHIA, and ALBIN, join in this opinion.

Justice ALBIN, concurring.

Sadly, the Court is passing through an artificially created crisis caused by one Associate Justice who has taken the unprecedented step of challenging the Chief Justice's constitutional authority to assign temporarily a Superior Court judge to fill a vacancy on the Supreme Court. Although a majority of the Court has determined that the Chief Justice has lawfully exercised his authority by temporarily assigning Judge Stern to the Supreme Court, one Associate Justice will not honor that decree, refusing to vote on matters before the Court and refusing to fulfill his own duties under the Constitution.

The Chief Justice is faithfully carrying out his constitutional responsibilities in accordance with the plain language of Article VI, Section II, Paragraph 1 of the New Jersey Constitution, *Rule* 2:13–2(a), and long-accepted custom. The Chief Justice has ex-

pressed his reasons for calling on a Superior Court judge to serve temporarily on the Supreme Court: to secure a full Court of seven members to address the approximately "two thousand matters and issues requiring action [that] will be presented to the Court for consideration this term," matters involving real "people who are trying to vindicate their rights as they await justice." *Henry v. N.J. Dep't of Human Servs.*, 204 *N.J.* 320, 340, 9 *A.*3d 882, 894 (2010) (Rabner, C.J., concurring).

To undermine the Chief Justice's authority, one Associate Justice has chosen to abstain in hundreds of cases, effectively reducing the Court to six members and depriving litigants of his vote in matters of utmost importance. He has taken the bench in cases argued before the Court, and plied the litigants with questions, all the while knowing that he would abstain. He has chosen to abstain, rather than to disqualify himself, thereby thwarting the Chief Justice from calling on another Superior Court judge to serve temporarily. He is engaging in a course of nullification knowing that a majority of the Court has endorsed the Chief Justice's constitutional authority to make the present temporary assignment.

The present crisis is not of the Chief Justice's making. He has merely exercised his constitutional authority in the same manner as have other Chief Justices over the past four decades. During those forty years, no Associate Justice or litigant with a case before the Court has questioned the Chief Justice's authority to make a temporary assignment of a Superior Court judge to bring the Court to a full complement of seven members.

Our "abstaining" colleague has sat on cases in which other Chief Justices have temporarily assigned a Superior Court judge to sit on the Supreme Court, even when not necessary to constitute a quorum, and has not abstained. *Id.* at 344 n. 2, 9 *A.*3d 897 n.2. Why now? Without a litigant challenging the Chief Justice's authority, our colleague has chosen to do so at this peculiar time.

Judicial restraint counsels that the Court not decide an issue when there is no concrete case or controversy before it. Yet, our

"abstaining" colleague injects a constitutional issue not raised, argued, or briefed by any litigant—based primarily on two academic articles that he widely quotes [1]—to declaim that, in his opinion, the Court is not properly constituted. *Id.* at 358–63, 371, 9 *A.*3d at 905–09, 913–14 (Rivera–Soto, J., abstaining). The scholarly musings of these two academics is that the Chief Justice cannot temporarily assign a Superior Court judge to serve on the Supreme Court other than to constitute a quorum. That supposition, however interesting, is at complete odds with the plain language of Article VI, Section II, Paragraph 1 of our State Constitution [2] and the consistent application of that constitutional provision for most of the modern history of our Supreme Court.[3] And the Chief Justice has dispatched that misbegotten notion with the dispositive analysis in his concurring opinion in *Henry v. New Jersey Department of Human Services. Id.* at 360–63, 9 *A.*3d at 906–09 (Rabner, C.J., concurring).

Our "abstaining" colleague has taken an inflexible position that does not account for other reasonable opinions or the possibility of

---

[1] The first of the publications to which our "abstaining" colleague cites is an article in the Seton Hall Law Review. Edward A. Hartnett, *Ties in the Supreme Court of New Jersey*, 32 *Seton Hall L.Rev.* 735 (2003). The other is a piece posted to the website of the Federalist Society. Earl M. Maltz, *Temporary Assignments to Fill Vacancies on the New Jersey Supreme Court* (2010), *available at* http://www.fed–soc.org/doclib/20100920_NewJerseyWP.pdf.

[2] "When necessary, the Chief Justice shall assign the Judge or Judges of the Superior Court, senior in service, as provided by rules of the Supreme Court, to serve temporarily in the Supreme Court." *N.J. Const.* art. VI, § 2, ¶ 1.

[3] Interestingly, Justice Jacobs—who served on the New Jersey Supreme Court from 1952 to 1975—was the Vice–Chairman for the Committee on the Judiciary at the 1947 Constitutional Convention, which was responsible for drafting the very constitutional provision in dispute. *See* 4 *Proceedings of the Constitutional Convention of 1947*, at iii. He also served on the Court in 1967 when the current rule, now denominated *Rule* 2:13–2(a), was promulgated, giving the Chief Justice specific authority to assign temporarily a Superior Court judge to serve on the Supreme Court in circumstances other than to constitute a quorum. *See R.R.* 1:1–5(b) (1967) (current version at *R.* 2:13–2(a)). He evidently saw no contradiction between the Constitution and the rule.

his own fallibility. Accepting his viewpoint compels the conclusion that Chief Justices Weintraub, Hughes, Wilentz, Poritz, and Zazzali were all mistaken and that, by making temporary appointments when not necessary for a quorum, hundreds of opinions were issued by an unconstitutionally constituted Court. The sheer number of prior Justices who have held an opinion different from his own should give him pause to consider that, perhaps, he is in error.

Our "abstaining" colleague makes the thinly veiled, seemingly scandalous charge that the Chief Justice is playing politics, even though he has acted no differently than other Chief Justices facing similar circumstances. *See id.* at 369–70, 9 *A.*3d at 912–13 (Rivera–Soto, J., abstaining). The discordant echo of politics rings from our "abstaining" colleague's opinion, not from the Chief Justice's stated reasons for making a temporary assignment. Our "abstaining" colleague says that the Chief Justice's filling a vacancy on the Court will be construed as the Court "having chosen sides in [an] impasse" between the Legislative and Executive branches of government, with the Court "having cast its lot—and that of the Judiciary as a whole—with the Legislature." *Id.* at 369–70, 9 *A.*3d at 913. By that strained logic, by making *no* temporary assignment, the Chief Justice would be casting his and the Court's lot with the Executive, still unavoidably entering what our colleague describes as a "political thicket." *See id.* at 370, 9 *A.*3d at 913. The Chief Justice cannot escape his constitutional responsibilities—one of which is to make temporary assignments to the Court "when necessary."

The appointment power of the Executive and the Legislature's role in passing on nominations is not the business of this Court, although our "abstaining" colleague has made it his business. He has engaged in the wild and corrosive supposition that the Chief Justice, by carrying out his mandated constitutional responsibilities, is empowering and emboldening "the Legislature to withhold, for whatever period it deems appropriate, consideration of any candidate nominated by the Governor." *See id.* at 370, 9 *A.*3d at

913. There is no basis for that speculative conclusion that invites a disparaging view of the judicial function. More importantly, as Justices, we cannot and must not calculate how we should decide a matter based on public perception, and surely not on how one of our rulings may be wrongly perceived, even by one of the other branches of government. It is our "abstaining" colleague who has needlessly politicized an independent, non-partisan decision by the Chief Justice, and he alone bears responsibility for the collateral damage done to the image of the judiciary.

At issue, ultimately, is whether a Justice of this Court has an obligation to respect the will of the majority. This Court—when four members speak with one voice—is the final authority on the interpretation of the State Constitution. The rule of law requires that every litigant, every citizen, and every government official abide by the decisions of this Court. Respect for the law—even one with which we disagree—must be a first principle for those serving on the highest Court of this State. No one is above the law, not even a Supreme Court Justice.

Filling a temporary vacancy on the Supreme Court is a responsibility vested by the Constitution in the Chief Justice. So long as he does so in accordance with the rules of the Supreme Court, the authority to determine when it is "necessary" to make a temporary assignment is his—no one else's.

Those of us privileged to serve on the Supreme Court do so not on behalf of any political party or cause, or partisan agenda. We serve to render impartial justice, to the extent humanly possible, without favoring any side or fearing the consequences. To falsely suggest that politics enters into our deliberations and to impugn the good faith of the Chief Justice as he fulfills his constitutional duties is a slur on the entire judiciary.

A majority of the Court has interpreted the Constitution as authorizing the Chief Justice to appoint Judge Stern to serve temporarily on the Supreme Court. Although a Justice may

disagree with that decision, he may not defy it. No one is above the law.

Justice RIVERA–SOTO, abstaining.

I abstain for the reasons set forth in my opinion in *Henry v. New Jersey Department of Human Services*, 204 *N.J.* 320, 9 *A.*3d 882 (2010) (Rivera–Soto, J., abstaining), namely that the Court, presently "constituted as one Chief Justice, five Associate Justices and a Judge of the Appellate Division selected unilaterally by the Chief Justice, . . . is unconstitutional and its acts are ultra vires[.]" *Ibid.* at 354, 9 *A.*3d at 903. I add, however, the following.

My determination to highlight the unconstitutional composition of the Court and the reasons therefor have triggered an overheated paroxysm of judicial hysteria. In this appeal alone, two separate concurring opinions attempt—albeit unsuccessfully—to either cajole, badger or threaten submission to the majority's tyrannical view of a constitutional question. Although that prattle largely is unworthy of the dignity of a reasoned response, some specific rejoinders are in order.

### I.

Having asserted the logical and plain conclusion that of necessity flows from the Court being unconstitutionally constituted, I stand accused of "ignor[ing] settled precedent and discard[ing] stare decisis." *Ante* at 550 (Rabner, C.J., concurring) 9 *A.*3d at 1018. The so-called "settled precedent" is, as noted in *Henry*, anything but settled and that concurrence's assertion is fundamentally misleading.

What that concurrence conveniently ignores is that the question of when it is "necessary" to temporarily assign a judge of the Superior Court for service in the Supreme Court in fact was raised as early as May 2007 and was largely resolved by December 2007. At that point, the Court considered the question of temporary assignments in two discrete settings: individual case

assignments and general assignments. As noted in a December 12, 2007 memorandum from the Clerk of the Court to the Supreme Court, "in respect of *individual case* callups, the Court has decided to limit temporary assignments from the Appellate Division to cases in which the assignments are necessary to establish a five-person quorum." (emphasis in original). That memorandum also noted a second scenario: "a *general* assignment to replace a member of the Court who is unable to participate in the Court's activities." (emphasis in original). In that instance, "[t]emporary assignments in this category are intended to result in a full complement of seven Justices." As the memorandum points out, this second scenario does not arise willy-nilly, but is limited to those instances where the "longterm unavailability of a Justice [is] due to illness or accident[.]" Neither of those admit the circumstances with which the Court presently is confronted: a vacancy in the Court arising out of a political stalemate.[1]

If there is, then, "settled precedent," it is straightforward but contrary to what the concurrence asserts: temporary assignments are constitutional either to satisfy the Constitution's five-person quorum requirement, *N.J. Const.* art. VI, § II, ¶ 1, or when a constitutionally nominated and confirmed Justice is unavailable, long-term, due to illness or accident. Neither applies here.

The Court also has decreed that it may act unconstitutionally and, under stare decisis, everyone must accept that decree and

---

[1] As this historical summary makes clear, the proper exercise of the temporary appointment power has been raised for several years and, for all intents and purposes, was resolved three years ago. To claim, as both concurrences do, that the issue is being raised as if for the first time is a threadbare rhetorical device that is both misleading and unworthy of this Court.

To be sure, as the concurrence notes, the December 12, 2007 memorandum's contents were not formally adopted by the Court or incorporated into changes to *Rule* 2:13–2(a). *Ante* at 555 n. 1, 9 A.3d at 1018 n. 1. However, since that time and as amply evidenced by later events, until now the Court has acted in a manner entirely consistent with those changes; to denigrate those changes by asserting that they were not formally adopted—all the while abiding by them—demonstrates an inconsistency irrationally devoid of reason.

follow the party line. That is an unfortunate mischaracterization of the doctrine of stare decisis. The doctrine does not require slavish adherence to abhorrent principles. As this Court recently noted:

> To be sure, stare decisis—following precedent—provides stability and certainty to the law. Those governed by decisions of this Court must know that they can rely on our pronouncements. For that reason, we do not lightly alter one of our rulings. Stare decisis, however, is not an unyielding doctrine..... Stare decisis does not compel us to continue on a mistaken path or to adhere blindly to rules that have lost their reason for being.
>
> [*Pinto v. Spectrum Chems. & Lab. Prods.*, 200 *N.J.* 580, 598, 985 *A.2d* 1239 (2010) (citations and internal quotation marks omitted).]

In an early case of this Court, Chief Justice Vanderbilt, in a ringing dissent, noted that "[t]he doctrine of *stare decisis* neither renders the courts impotent to correct their past errors nor requires them to adhere blindly to rules that have lost their reason for being." *Fox v. Snow,* 6 *N.J.* 12, 23, 76 *A.*2d 877 (1950) (Vanderbilt, C.J., dissenting). He emphasized that "[t]he common law would be sapped of its life blood if *stare decisis* were to become a god instead of a guide. The doctrine when properly applied operates only to control change, not to prevent it." *Ibid.* Prophetically, Chief Justice Vanderbilt's view, although expressed then in dissent, has become this Court's standard. *White v. Twp. of N. Bergen,* 77 *N.J.* 538, 551–52, 391 *A.*2d 911 (1978) ("However unpersuasive it was to the *Fox* court majority in 1950, [Vanderbilt's] philosophy has clearly guided this Court since, as exemplified in many of its decisions. We have agreed with the Vanderbilt thesis that the process of justice is not bound, as though by some strange sort of Mendelian law, to accept the hereditary transfer of now visible defects in justice, from generation to generation; that no such inevitability is required by the principle of *stare decisis,* and that the Court ... has authority to intervene against operation of any such fallacy.").

In contrast, when a Justice historically has refused to abide by court decisions solely on the basis of what can only be called a politically correct notion, the hue and cry of stare decisis curiously is not raised. For example, dissenting from the denial of a writ of

certiorari in a capital case, Justice Blackmun unilaterally concluded that capital punishment was unconstitutional, dramatically announcing that "[f]rom this day forward, I no longer shall tinker with the machinery of death." *Callins v. Collins*, 510 *U.S.* 1141, 1145, 114 *S.Ct.* 1127, 1130, 127 *L.Ed.*2d 435, 438 (1994). Yet, despite the unquestioned fact that a majority of the Supreme Court of the United States repeatedly reaffirmed the constitutionality of the death penalty, Justice Blackmun never wavered from his deeply held view and, more to the point, none of his colleagues ever displayed the naked arrogance of castigating him for, purportedly, ignoring stare decisis.

In its implications, the concurrence seemingly asserts that the doctrine of stare decisis does not differ in any material respect from the divine right of kings, that is, a decision reached by the brute force of numbers of this Court cannot be questioned or challenged; it is to be accepted without question. That reading of the doctrine of stare decisis is grotesquely overbroad, and the notion that a majority headcount standing alone can silence permanently a discordant voice is simply too absurd for words. For example, if the doctrine is as broad as the concurrence would have it, the state of the law in this country would still be that separate but equal facilities for different races is constitutional, *Plessy v. Ferguson*, 163 *U.S.* 537, 16 *S.Ct.* 1138, 41 *L.Ed.* 256 (1896), and Justice Harlan's exhortations in dissent, *id.* at 552, 16 *S.Ct.* at 1144, 41 *L.Ed.* at 261, would be relegated to the dustbin of rousing but unpersuasive rhetoric. Constitutional history teaches otherwise, and the constitutional history of this State, in particular, is replete with contrary examples. *See, e.g., Lewis v. Harris*, 188 *N.J.* 415, 908 *A.*2d 196 (2006) (recognizing, for first time, constitutional basis for governmental sanction of same-sex unions); *State v. Peña–Flores*, 198 *N.J.* 6, 965 *A.*2d 114 (2009) (rejecting constitutional basis for automobile exception to warrant requirement otherwise recognized in every other American jurisdiction); *State v. Hempele*, 120 *N.J.* 182, 576 *A.*2d 793 (1990) (recognizing, for first time, a constitutionally protected expectation of privacy in trash left at curbside unique to New Jersey). That contrary

history—one of which this Court often proudly crows—lays forgotten in the din raised by the concurrence.

## II.

In a separate concurrence, the position I have advanced has been called an "artificially created crisis[,]" one in which I have "refus[ed] to vote on matters before the Court and refus[ed] to fulfill [my] own duties under the Constitution." *Ante* at 553 (Albin, J., concurring) 9 *A.*3d at 1017. The stridency of that concurrence provides its own response.

That said, that concurrence chides me for having "sat on cases in which other Chief Justices have temporarily assigned a Superior Court judge to sit on the Supreme Court, even when not necessary to constitute a quorum, and has not abstained." *Id.* at 554, 9 *A.*3d at 1018. One is sorely tempted blithely to reply—tongue firmly planted in one's cheek—with what Justice Clifford referred to as either "that reassuring old turkey" or "that old chestnut": " 'The matter does not appear to me now as it appears to have appeared to me then.' Bramwell, B., in *Andrews v. Styrap*, 26 *L.T.R.* (n.s.) 704, 706 (Ex. 1872)[.]" *Tretina v. Fitzpatrick & Assocs.*, 135 *N.J.* 349, 367, 640 *A.*2d 788 (1994) (Clifford, J., concurring); *Moraca v. Ford Motor Co.*, 66 *N.J.* 454, 466, 332 *A.*2d 599 (1975) (Clifford, J., dissenting). In a light-hearted vein, that is the extent of any needed reply.

There is, however, a more serious and pointed response. As noted earlier, the process by which this Court re-examined temporary assignments to the Court was subject to review three years ago, a review prompted by deeply felt and strongly held concerns that the until-then process of temporary appointments contravened the explicit language of the Constitution. Also as noted earlier, those concerns resulted in a Court determination that a temporary assignment would be made only in two circumstances: on an individual case basis to meet the quorum requirement, and on a general basis due to the long-term unavailability of a Justice due to illness or accident. Once that ship was righted, there was

no need to raise again that issue, as the Court steadfastly—and in the face of public opposition—hewed to those principles. It is only now that, for reasons that have nothing to do with the "necessity" required by the Constitution, those principles have been cast aside, resulting in a Court that presently is unconstitutionally constituted.[2]

That concurrence also asserts, in rather colorful terms, that my refusal to bow down to the majority's will—or to the tyranny of this particular majority—somehow violates precepts of good judging.[3] In so doing, that concurrence plainly ignores the rather stark difference between acknowledging a decision of this Court and opposing it. My opposition to the Court's wrongful exercise

---

[2] The vacancy that has caused this uproar has existed since May 2010, yet no Superior Court judge was temporarily assigned to the Court until September 2010. In the interim, the Court was more than able to address its business, hear arguments, render decisions, and meet its constitutional obligations while comprised of one Chief Justice and five—not six—Justices, including a case of significant constitutional import. *See Comm. to Recall Robert Menendez from the Office of U.S. Senator v. Wells,* 204 *N.J.* 79, 7 A.3d 720 (2010). During that period, the work of the Court was completed and the wheels of justice did not come to a screeching halt. Against that factual backdrop, how the temporary appointment of a Superior Court judge is at all "necessary" remains both unexplained and, more to the point, unexplainable.

[3] In this respect, the concurrence's insistence on its majoritarian will is nothing more than pure cynicism, a bankrupt view shared by like minds:

> [U.S. Supreme Court Justice William J.] Brennan liked to greet his new clerks each fall by asking them what they thought was the most important thing they needed to know as they began their work in his chambers. The pair of stumped novices would watch quizzically as Brennan held up five fingers. Brennan then explained that with five votes [a majority of the Court], you could accomplish anything.
>
> Seth Stern & Stephen Wermiel, *Justice Brennan: Liberal Champion* 196 (2010).

That obscenely cynical view arises because " '[s]ome well-meaning people apparently believe that the judicial rather than the political process is more likely to breed better solutions of pressing or thorny problems. This is a compliment to the judiciary but untrue to democratic principle[.]' " *Harlan Cautions on Role of Court; Warns of Growing Reliance on Judiciary by Society,* N.Y. *Times,* Aug. 14, 1963 at 18.

of the temporary assignment power consists of: participating fully in each matter before the Court, just like any other Justice; explaining my views and how I reach them in each such instance, again just like any other Justice; but abstaining from any decision thereon, a decision—how a Justice casts his or her vote—that is uniquely personal and, more to the point, immune from any other Justice's views. In that context, that concurrence's feigned horror at that latter part—a vote of abstention—is, in its proper context, laughable.

That concurrence happily ignores that abstentions from decisions of the Court have been registered for years and, yet, no "artificially created crisis" has arisen. For example, each time the Court is presented with an application seeking the recall of a judge of the Superior Court who is older than seventy, I have abstained from that decision. In my view, the plain constitutional proscription that "justices and judges *shall be retired* upon attaining the age of 70 years[,]" *N.J.* Const. art. VI, § VI, ¶ 3 (emphasis supplied), is clear and brooks no different interpretation. Yet, this Court repeatedly has recalled and continues to recall to service judges who are older than seventy and, curiously, has arbitrarily set its own limit on recall at age eighty. Stated in starker terms, the Court blithely ignores a clear constitutional mandate in preference for an arbitrary one of its own making. Although the aggregate number of those abstentions now must be rather significant, inexplicably they have not stirred the invective that concurrence now musters.

### III.

The Nobel Laureate and dramatist George Bernard Shaw once observed that "[t]he reasonable man adapts himself to the world; the unreasonable one persists in trying to adapt the world to himself. Therefore, all progress depends on the unreasonable man." George Bernard Shaw, *Quotations, available at* http://www.quotationspage.com/quote/2097.html. No doubt, some have claimed and undoubtedly will claim that, viewing uncritically and

abstractly this Court's prior history and practice, the position I have advanced as to the Constitution's strictures may be unreasonable and, perhaps, even incorrect. Although the views I have espoused may arouse passionate responses, one thing remains clear: the positions I have taken in this matter align far more closely with the explicit mandates of our Constitution than the unvarnished arbitrariness at the core of both concurrences. For me, the choice between going along and asserting a heartfelt belief or between collegiality and constitutionality is no choice at all. In either event, it is the Constitution—and not this Court's constitutionally untethered and arbitrary wishes—that must reign supreme, and it is to the Constitution that my allegiance is bound by oath.

For each of those reasons, I abstain.

*For Reversal and Reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, HOENS, and STERN—6.

*For Abstaintment*—Justice RIVERA–SOTO–1.

*Opposed*—None.