# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3119-23

L.R.M.,[1]

    Plaintiff-Appellant,

v.

T.R.M.,

    Defendant-Respondent.

_____

        Submitted November 5, 2025 – Decided March 5, 2026

        Before Judges Gooden Brown and Torregrossa-O'Connor.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-1484-24.

        Partners for Women and Justice, and McCarter & English LLP, attorneys for appellant (Michele C. Lefkowitz, Adam N. Saravay, and Leroy E. Foster, on the brief).

---

[1] We use initials to protect the parties' confidentiality pursuant to Rule 1:38-3(c)(12).

Respondent has not filed a brief.

PER CURIAM

In this one-sided appeal, plaintiff L.R.M. appeals from the April 26, 2024 Family Part order denying a final restraining order (FRO) and dismissing her temporary restraining order (TRO) after a hearing. Plaintiff had obtained a TRO against defendant T.R.M., her biological father, pursuant to the Prevention of Domestic Violence Act of 1991 (PDVA), N.J.S.A. 2C:25-17 to -35, based on the predicate acts of sexual assault and contempt. Because of the cumulative effect of the errors in this case, we reverse and remand for a new hearing.

I.

On October 19, 2023, plaintiff obtained a TRO against defendant that was subsequently amended on January 10, 2024. In her underlying domestic violence complaint, plaintiff alleged defendant had sexually assaulted her on multiple occasions in their home, starting when she was age twelve and continuing until she was age twenty.

Specifically, the complaint alleged that in 2014, defendant "digitally penetrated [plaintiff] against her will" and "rap[]ed [plaintiff]." Additionally, according to the complaint, on March 31, 2020, and March 31, 2021, plaintiff's birthday, defendant allegedly "raped" plaintiff. The complaint also alleged that

in June and July 2021, defendant "raped" plaintiff, and the June 2021 incident caused plaintiff to "test[] positive for chlamydia." The complaint added that on July 15, 2022, and in July 2023, defendant allegedly "raped [her]." The last sexual assault alleged in the complaint occurred on October 1 or 2, 2023. Further, according to the complaint, on August 31, 2023, defendant allegedly "sent [plaintiff] a voice note regarding sexual intercourse" and on September 6, 2023, defendant "sent [plaintiff] a voice note regarding her failure to finish him."

In the complaint, plaintiff also alleged instances of physical abuse occurring in 2014 when defendant "whipped [plaintiff] with a wire"; in 2017 when defendant "strangled [plaintiff]" and "hit [plaintiff] with a tree branch and a golf club causing injury"; and on July 15, 2022, when defendant hit plaintiff "with a pool cue." The complaint further alleged two separate instances of contempt when defendant followed plaintiff and called her, both in violation of the TRO.

At the FRO hearing conducted on March 26 and April 1, 2024, plaintiff recounted in detail the incidents alleged in her complaint. Plaintiff testified the sexual assaults occurred in the three-bedroom house where defendant and plaintiff resided. Plaintiff described the layout of the house and stated "over ten people" lived in the house at the time. According to plaintiff, the occupants

included plaintiff's "stepmother," N.C., whom "defendant [wa]s in a relationship with" and defendant's other children.[2]

Plaintiff testified defendant would sexually assault her "about five time[s] or more a month," usually in defendant's bedroom. According to plaintiff, the first assault occurred in 2014 when defendant digitally penetrated her. Plaintiff specifically described the sexual assaults that occurred on March 31, 2020, and March 31, 2021, her seventeenth and eighteenth birthdays, respectively, when defendant would "allow[ her] to drink and smoke a little." On each occasion, after plaintiff went to sleep, defendant awakened her, pulled down her pants, and "proceed[ed] to have sex with [her] while [she was] intoxicated." According to plaintiff, following the June 2021 sexual assault, she "tested positive for chlamydia." Plaintiff stated she was not sexually active at the time and could not have contracted chlamydia from anyone other than defendant.

Although plaintiff could not recall whether she "went out with friends" prior to the July 2021 sexual assault, she stated it occurred like most other times when defendant assumed plaintiff had been with a boy and, as a result, would check by placing his "fingers inside [plaintiff's] vagina first, and then . . . pull [her] pants down and proceed to have intercourse with [plaintiff]." Plaintiff

---

[2] Defendant reportedly had eleven other children with different women.

4

stated every time defendant said, "Let me check," it meant "defendant was about to sexually assault [her]."

Plaintiff further testified that "in or around July 15[,] . . . 2022[,] . . . defendant hit [her] with a pool cue and [then] raped [her]."  Plaintiff had gone "to the movies . . . with . . . friends and [her] little brother" and upon her return, defendant asked plaintiff for her phone because defendant believed plaintiff "was . . . there with a boy."  When plaintiff refused, defendant "whacked [plaintiff] with the pool stick on [her] leg which left a . . . big purple bruise," making it difficult for plaintiff to walk.  According to plaintiff, that same day, defendant "raped [her] because [she] wouldn't open [her] phone for [defendant]."  Due to the injury to her leg, plaintiff wore "bigger pants to hide" it and "stayed in bed" the following days.  Plaintiff took a photo of her injuries on the day of the assault, which was admitted into evidence at the hearing.

Regarding the July 2023 sexual assault, plaintiff explained defendant believed she was "having intercourse with a boy" and "got angry with [her] for going out with friends."  Once plaintiff came home, defendant "proceeded to ask . . . questions" about her activities.  Later that night, defendant "proceeded to finger [her] . . . vagina and . . . have intercourse with [her]."

A-3119-23

Plaintiff further testified that the last sexual assault occurred on October 2, 2023, when defendant "called [her ]to his room and . . . proceeded to have intercourse with [her]." Plaintiff stated defendant "first vaginally fingered [her] with one finger" and then "proceeded to put his [penis] inside of [her]." According to plaintiff, her seven-month-old godson and her eight-year-old younger brother were asleep in the same room when the assault occurred.[3]

In response to the judge's question about N.C.'s whereabouts during the sexual assaults, plaintiff replied that the incidents would occur "when [N.C. would] leave for work" at night. After N.C. would leave, defendant would "make his way to . . . wake [plaintiff] . . . to have intercourse."

Plaintiff also related the other physical assaults documented in her complaint. Plaintiff testified defendant "whipped [her] with a [speaker] wire" in 2014 because defendant "assumed that [plaintiff] was having sex with [a] grown man," which plaintiff denied. Plaintiff stated she "still ha[s] a mark on [her] leg" from when defendant hit her. Plaintiff further testified "defendant strangled [her]," "hit [her] with a tree branch and a golf [c]lub", and confiscated her phone in 2017 because he believed plaintiff "was harassing people . . . on

---

[3] Defendant was charged on December 12, 2023, by complaint-warrant with various counts of first-degree aggravated sexual assault and related offenses in connection with plaintiff's allegations.

social media," an accusation she denied. The assault with the golf club left plaintiff with a scar on her left eyebrow.

Plaintiff produced two voice messages defendant sent her. In the first, dated August 31, 2023, defendant stated, "Look, I look at your favor-for-favor, why don't you let me play with it and finish real quick. I want to shoot this shit out." Plaintiff explained defendant was referring to her "vaginal area" when defendant asked to "play with it," and was referring to an ejaculation when stating he "want[ed] to shoot this shit out." The voice message was admitted into evidence and played at the hearing.

The second voice message dated September 6, 2023, pertained to plaintiff's "failure to finish [defendant]." Plaintiff stated before sending the voice recording, defendant had "called [her] into the room . . . to have sexual intercourse" with her but they were interrupted, after which plaintiff "immediately pull[ed her] pants up and went to lay back down." Plaintiff believed defendant was referring in the recording to her "letting him finish having sexual intercourse with [her]." The second message was also admitted into evidence and played at the hearing. Plaintiff explained defendant "sen[t] voice messages because he [did not] know how to text."

A-3119-23

Plaintiff stated she had repeatedly told defendant she did not want to have sex with him, but he responded if she could have sex with "[her] boyfriend," she could have sex with defendant since he was "not an outsider." Plaintiff testified she was "fearful of . . . defendant," did not "want to be in th[e court]room with him," and had "trust issues" with others. She stated she never told any of her siblings about the abuse while it was ongoing and she "had no contact with [her] mom" because of defendant. She testified she confided in people she felt "comfortable with" such as the basketball coach[4] and "a close friend" from school. She disclosed the abuse to the coach after she graduated from high school around the summer of 2022 but implored him not to report the abuse to the New Jersey Division of Child Protection and Permanency (DCPP) because she "didn't want things to backfire on[] him."

Plaintiff testified after obtaining the TRO and moving out of the house, she "felt a little relieved." However, she believed if the TRO did not become permanent, defendant would "kill [her]." Plaintiff cited two instances in which defendant violated the TRO. The first incident occurred on November 27, 2023, when she was driving near defendant's home and noticed defendant following her. As they were driving, defendant "rolled down his window and tried to speak

---

[4] Plaintiff referred to the coach as "the dean."

A-3119-23

[with plaintiff]." Plaintiff "went home, got [her] restraining order[,] and . . . immediately went to the police station where [defendant] met [her] . . . and . . . began to threaten [her]."[5] At the police station, plaintiff overheard defendant telling relatives on the phone, "[T]he bitch is lying and she came to my house and knowing she's not supposed to be here," referring to plaintiff. Plaintiff testified after defendant followed her, she was "scared" and felt that her "life was in jeopardy."

Plaintiff testified defendant violated the TRO a second time on January 4, 2024, when he "called [her]." Plaintiff stated she was on the phone with her "younger sister . . . and [her] younger brother" when defendant "joined the call and called [plaintiff] from his phone." Plaintiff did not "answer the phone call." "A screenshot of [defendant] FaceTiming [plaintiff]" on January 4, 2024, was admitted into evidence at the hearing. Defendant disputed the claim, explaining he never initiated the call.

Plaintiff produced I.P., her step-sister, who testified defendant had similarly sexually assaulted her.[6] Defendant was not I.P.'s biological father, but N.C. was I.P.'s mother and I.P. lived in the house with plaintiff and defendant at

---

[5] At this point, the parties were no longer residing together.

[6] I.P. testified virtually.

the time in question. I.P. also testified she witnessed defendant hit plaintiff with the "speaker wire" in 2014 and observed "bruises all over [plaintiff's] body from the wire."

In his defense, defendant denied all the allegations. He asserted plaintiff's testimony was fabricated and coached "to retaliate [against him] for her mom." Defendant also attributed plaintiff's motive for lying to the fact that both plaintiff and I.P. were sleeping with "[t]he basketball coach" while they were students. Defendant claimed "he [had] multiple women" and did not "need to sleep with [his] own flesh and blood." He also asserted, "I got six daughters so why tamper with one." Defendant introduced photographs, including photos of plaintiff's prom, high school graduation, and family gatherings, all of which were admitted into evidence, to show that contrary to her testimony, plaintiff had a happy childhood.

Defendant produced several witnesses at the hearing. Defendant's biological son, K.M., who had the same biological mother as plaintiff,[7] testified he never witnessed defendant "do any sexual assault." According to K.M., their

---

[7] K.M. testified DCPP removed him and plaintiff from their mother's custody when they were young. Defendant was incarcerated at the time for unspecified reasons. Upon his release, DCPP placed the children in defendant's custody. According to defendant, plaintiff was five years old at the time.

A-3119-23

mother offered plaintiff money to fabricate the allegations, an accusation plaintiff strenuously denied. K.M. stated there was never a time when plaintiff and defendant were "in the house by [themselves]" and it was not possible for defendant to enter plaintiff's room without someone noticing. K.M. also testified he did not witness defendant "beat [plaintiff] with a wire."

As to the voice recordings, K.M. testified plaintiff had access to the iCloud account[8] on defendant's phone and knew "how to get everything off [defendant's] phone." Plaintiff denied the accusation. She explained although she "set everything up," defendant was in charge of his iCloud account and their devices were never synced.

Defendant also produced his friend, N.N., with whom he had been romantically involved. N.N. testified she never saw defendant assault plaintiff. Likewise, defendant's brother, A.M., testified for defendant that he had never seen defendant sexually assault plaintiff when A.M. spent the night at their house and plaintiff never told him about any abuse despite them having a good relationship.

---

[8] iCloud is a service provided by Apple Inc. that "allows users, via an [i]nternet connection, to upload their personal digital content . . . to Apple's remote servers and access their personal digital content from any of their Apple devices or other devices connected to the [i]nternet." Jaye A. Calhoun, iCloud Storage Subscription Fees Held Not Subject to Sales Tax, 71 La. Bar J. 59, 59 (2023).

Defendant produced his mother, J.M., to testify. However, after conducting a N.J.R.E. 104 hearing, the judge ruled J.M.'s testimony was inadmissible hearsay. As the FRO hearing continued, the judge asked J.M., who had remained in the courtroom, whether she had been a client of the judge "about [twenty] years ago." After J.M.'s recollection was refreshed, she confirmed the judge had represented her in connection with an automobile accident.

Plaintiff's counsel expressed "no concerns" with the judge's prior representation of defendant's mother and plaintiff did not believe the judge would be "prejudice[ed] against her based on that representation." Likewise, defendant interposed no objection.

Nonetheless, the judge "recuse[d] herself from th[e] matter," determining "that despite the waivers by both parties, . . . there could be a cloud on the [court's] impartiality no matter the decision in th[e] case." Applying Judicial Conduct Canon 2 and Rule 3.17(B)(3)(b), the judge reasoned "the facts and issues in th[e] case [we]re extremely sensitive and the court sh[ould] err on the side of caution because it [wa]s the [court's] belief[] that there could be a reasonable question on impartiality or the appearance of impartiality by either party once a decision [was] rendered."

As a result of the disqualification, another judge assumed responsibility for the trial and continued the FRO hearing on April 12 and 24, 2024.[9] Prior to eliciting live testimony, the judge explained she had reviewed the CourtSmart recordings of the prior testimony as well as the exhibits previously admitted into evidence. The judge then questioned plaintiff, eliciting additional details about each allegation. The judge specifically queried plaintiff about gaps between her testimony that defendant had sexually assaulted her about five times per month and her testimony about specific incidents occurring on a less frequent basis. Plaintiff explained "[t]hose dates stuck out to [her]" and there was "something about [those] date[s] that made [her] remember exactly what happened."

After confirming defendant had not concluded his direct testimony, the judge queried defendant about his prior testimony and allowed defendant to augment his testimony. Defendant testified an additional motive for plaintiff's false accusations was their dispute over the ownership of a dog and defendant's issues with plaintiff's boyfriends. Defendant reiterated that he had been incarcerated in 2013 and was not released until 2014 when the first sexual assault allegedly occurred. According to defendant, after the children were

---

[9] On April 12, 2024, the judge informed defendant that the TRO was amended, effective today, adding contempt as a predicate act because there was testimony defendant violated the restraining order.

returned to his custody in 2014, the Division of Youth and Family Services (DYFS) was still involved with the family and made frequent visits.

Defendant produced N.C. as an additional witness. N.C. confirmed that she had been living with defendant since 2012 or 2013, and testified that the August 31, 2023 voice message was sent to her, not plaintiff. N.C. did not recognize the September 6, 2023 voice message. N.C. denied witnessing or having any knowledge of any of plaintiff's allegations. N.C. confirmed she worked the night shift and testified she would have been up getting ready for work on October 2, 2023, when plaintiff claimed defendant had sexual intercourse with her in her bedroom.

Regarding the 2017 assault with the golf club that allegedly left plaintiff with a scar on her left eyebrow, N.C. testified plaintiff had the scar when she first met her. Although N.C. denied ever witnessing defendant beat plaintiff, she acknowledged that defendant would "pop" the children. Additionally, regarding the November 27, 2023 incident at the police station, N.C. corroborated defendant's account that he was not following plaintiff but

14

attempting to file a complaint against her for violating the TRO by driving on the same street as his house.[10]

Ka.M., another one of defendant's children, also testified for defendant. Ka.M. and plaintiff had the same mother. Ka.M. was aware of plaintiff's accusations against defendant because plaintiff disclosed them to him after reporting the abuse to police. However, Ka.M. testified he never witnessed anything and knew nothing about the allegations.

At the judge's request, I.P. was recalled to testify.[11] I.P. clarified she lived in defendant's house for approximately six years, from the age of twelve to eighteen. I.P. testified she first learned about plaintiff's allegations after defendant had been arrested, not while she resided in the house. I.P. stated "over the years," she was also sexually assaulted by defendant "a couple of times per month" while the other occupants were either "asleep" or "out of the house." I.P. testified the assaults involved vaginal penetration and occurred in "[t]he bathroom, the back porch, or [defendant's bed]room" when N.C. "was working the night shift[]."

---

[10] Nonetheless, defendant admitted exchanging words with plaintiff at the police station.

[11] I.P. again testified virtually.

I.P. also testified that one night, when she was thirteen years old, defendant drove her to a park, "punched [her] in [the] face" and "raped [her]." According to I.P., after defendant punched her, her "lip was swollen" and everyone in the house saw her injury but said nothing because defendant's abuse was normal in the household. Although she was "bleeding" after the incident, I.P. did not "go to the doctor," disclose it to anyone, or "report it to DYFS" because defendant discouraged her from doing so.

I.P. also testified defendant "checked [her] panties regularly." I.P. stated "[e]very time . . . [defendant] wanted to rape [her]," defendant would ask to "check [her] panties" or "smell [her] vagina." When asked by the judge whether she "ever ha[d] chlamydia," "ever ha[d] a pregnancy scare," or "[took] any preventative measures not to become pregnant," I.P. replied that she did not. I.P. added that when she was older, she "was on Plan B" and "had a boyfriend at the time."

I.P. told her mother, N.C., about the abuse "about a year after [I.P.] moved out" of the house.[12] After I.P. told her mother, I.P. "filed a police report." I.P. testified she did not "feel safe enough to tell anyone about th[e] abuse prior to

---

[12] During her testimony, N.C. denied I.P. disclosed any sexual abuse by defendant to her.

moving out of the home." I.P. also stated she "move[d] out of state . . . to get away from . . . defendant."

In response to I.P.'s testimony, defendant claimed "[t]he only reason [I.P.] started making these allegations" was because defendant discovered "[I.P.] . . . was sleeping with . . . [the coach]." I.P. denied the accusation.

Following the hearing, the judge rendered a decision on April 26, 2024. In an oral opinion on the record, after applying the Silver[13] analysis, the judge rejected plaintiff's account, determined plaintiff failed to meet the requisite burden of proof, and denied plaintiff an FRO. At the outset, the judge found plaintiff "qualifie[d] as a victim of domestic violence as defined by the [PDVA] because the parties are biological father and daughter who live[d] together in the same home,"[14] thus satisfying the jurisdictional requirement of the PDVA.

The judge then noted "there were pervasive credibility issues across testimonies."[15] As to defendant, the judge explained:

---

[13] Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006).

[14] N.J.S.A. 2C:25-19(d) defines a victim of domestic violence as "any person who is [eighteen] years of age or older . . . and who has been subjected to domestic violence by a . . . person who . . . was at any time a household member."

[15] The judge noted that in addition to reviewing the CourtSmart testimony, she was able to observe plaintiff testify in person along with defendant and other witnesses.

> Defendant generally denies all of . . . plaintiff's allegations and testified he believes . . . plaintiff is being motivated by others including financial motivation, retaliation for what occurred between him and plaintiff's mother, plaintiff's anger towards him regarding a dispute over the ownership of a dog as well as defendant's issues with . . . plaintiff's boyfriends.

The judge found defendant "somewhat credible . . . with the exception of the general denial about all of . . . plaintiff's allegations." In particular, the judge noted defendant's claim that he had never hit his children was contradicted by N.C.'s credible testimony that she had witnessed defendant "bop" the children.

Turning to plaintiff's credibility, after reciting plaintiff's testimony, based on a series of findings, the judge found "plaintiff to not be entirely credible." First, the judge "struggle[d]" with plaintiffs' testimony that "the[] sexual assaults occurred about five times a month . . . for approximately eight years" because plaintiff testified that "there [we]re ten people in the home" and no one was aware of the sexual assaults.

Next, the judge focused on contradictions and "inconsistencies" in plaintiff's testimony "that raise[d] concerns." Specifically, regarding the March 31, 2020 sexual assault, the judge pointed out that although plaintiff testified "her sisters were in the room during the incident but not in the same bed," on redirect, "plaintiff testified that no one else was in the room or in the house."

18

As to the 2014 sexual assault, the judge noted plaintiff's TRO "reference[d] only fingering" while "her testimony referenced both fingering and sexual intercourse occurring." The judge further questioned why "plaintiff did not call the friend that she said she told as well as . . . [the coach] who she alleged she told as well."

The judge further commented "plaintiff initially testified on direct that as a result of [an] assault," plaintiff decided to undergo testing for sexually transmitted diseases but "on redirect by the [c]ourt[,] plaintiff testified she went to the doctor[] because . . . her blood was extremely low and then decided to get tested there." Further, the judge recounted plaintiff testified she "observed . . . defendant taking . . . chlamydia medication" but "on redirect, . . . plaintiff said" she "did not know what [the medication] was," only that "she read . . . defendant's medication to him since . . . defendant is illiterate." Additionally, confusing I.P.'s testimony with plaintiff's, the judge stated she "struggle[d]" with plaintiff's testimony that "she did not use birth control except Plan B with a boyfriend" despite "a pattern of being sexually assaulted by [defendant]."

As to the audio clips plaintiff claimed defendant had sent, the judge found defendant's account that he had sent one of the clips to N.C. and K.M.'s testimony that "plaintiff ha[d] complete access to . . . defendant's iCloud account" sound. In that regard, the judge found N.C.'s testimony that she had

19

received one of the voice messages "credible." As a result, the judge questioned whether "defendant sent any audio clips directly to . . . plaintiff." Further, the judge credited K.M.'s testimony that plaintiff had "setup . . . defendant's iCloud account" and that "defendant's phone was linked to . . . plaintiff's."

The judge also highlighted how plaintiff testified that "defendant was also having sexual relations with . . . [I.P.]" but "[I.P.] testified that she never told anyone[,] including . . . plaintiff[,] about . . . defendant sexually assaulting her." Additionally, the judge pointed out "plaintiff testified that [I.P.] also mentioned these sexual assaults to [the coach]," but I.P. testified she "informed no one about the sexual assaults other than her mother a year after [I.P.] left home."

Regarding I.P.'s substantive testimony, the judge determined it "ha[d] no relevance to the core issues of the case" because I.P. "testified that she ha[d] no first-hand knowledge about . . . plaintiff's allegations and . . . [I.P.] never had a conversation with . . . plaintiff before or after . . . defendant's arrest." The judge stated plaintiff called I.P. "as a witness because . . . [I.P.] testified about similar sexual activity between her and . . . defendant." However, according to the judge, I.P.'s testimony was precluded under N.J.R.E. 404(b)(1) which "provides that evidence of any other crime, wrong, or act is not admissible to . . . prove a

20

person's character." The judge also determined that "the probative value of . . . [I.P.]'s testimony [was] outweighed by its prejudicial value."

Specifically addressing the predicate acts, the judge first considered the contempt allegations and found defendant's version of the meeting at the police station credible "because it was corroborated by [N.C.]'s testimony" and "if . . . defendant was intentionally violating the [TRO,] he would have not gone to the police station . . . to turn himself in." Further, according to the judge, "[t]he interaction at the precinct appear[ed] to have been coincidental rather than orchestrated or initiated by . . . defendant." Thus, the judge concluded the "actions [did] not meet the requirements for contempt as there [was] no evidence of deliberate or intentional violation of the [TRO] by . . . defendant." Regarding the January 4, 2024 FaceTime group call, after reviewing the exhibit, the judge found "it [was] clear that . . . defendant did not initiate the call."

As to the sexual assault allegations, the judge referred to her credibility findings and concluded "the evidence [wa]s in equipoise." The judge determined the "presumption of innocence tilt[ed] the scales in favor of . . . defendant and the burden of proving the predicate act by a preponderance of the

evidence ha[d] not been met."  Thus, the judge denied the FRO, dismissed the

TRO, and denied a stay pending appeal.[16]  This appeal followed.

On appeal, plaintiff raises the following points for our consideration:

I.    THE   TRIAL   COURT   IMPROPERLY
EXCLUDED [I.P.]'S TESTIMONY AFTER FAILING
TO   APPLY   THE   COFIELD[17]   TEST   TO   THE
EVIDENCE OF DEFENDANT'S OTHER CRIMES,
WRONGS, AND ACTS.

II.    THE FIRST TRIAL JUDGE'S RECUSAL WAS
UNNECESSARY   AND   IMPROPER   AND
AFFECTED   THE   SECOND   TRIAL   JUDGE'S
CREDIBILITY   ASSESSMENTS   OF   THE
WITNESSES.

III.    THE TRIAL COURT ERRED BY DRAWING
AN ADVERSE INFERENCE BASED ON THE FACT
THAT PLAINTIFF DID NOT CALL THE "DEAN"
AND A FRIEND AS WITNESSES.

IV.    THE TRIAL COURT MADE A TWO-FOLD
ERROR   BY   CONCLUDING   THAT   [I.P.]'S
TESTIMONY   ABOUT   NOT   USING   BIRTH
CONTROL   IMPAIRED   PLAINTIFF'S
CREDIBILITY.

V.    THE TRIAL COURT ERRONEOUSLY FOUND
THAT   PLAINTIFF'S   TESTIMONY   ABOUT   THE

---

[16]  Referring to the pending criminal charges, the judge commented that "even if [defendant was] released," he would be subject to "an order preventing him from having any contact with . . . [plaintiff]."

[17]  State v. Cofield, 127 N.J. 328 (1992).

2014 SEXUAL ABUSE WAS INCONSISTENT WITH THE ALLEGATIONS IN THE [AMENDED ]TRO.

VI. THE TRIAL COURT'S SEVERAL ERRORS REGARDING ITS ASSESSMENT OF PLAINTIFF'S CREDIBILITY COLLECTIVELY CONSTITUTE CUMULATIVE ERROR WARRANTING A NEW TRIAL.

VII. THE TRIAL COURT ERRONEOUSLY ANALYZED WHETHER DEFENDANT COMMITTED A CONTEMPT OF THE TRO, INCLUDING BY FAILING TO CONSIDER WHETHER HIS UNDISPUTED COMMENTS AT THE POLICE STATION VIOLATED THE TRO.

VIII. THE TRIAL COURT'S RULING THAT PENDING CRIMINAL PROCEEDINGS MADE A FINAL RESTRAINING ORDER UNNECESSARY WAS DIRECTLY CONTRARY TO THIS COURT'S HOLDING IN S.D. v. M.J.R.[18]

II.

We first address plaintiff's argument the first judge "erred in recusing herself from th[e] case, as there is no indication in the record that her disqualification was necessary or appropriate." We agree.

"Judges shall disqualify themselves in proceedings in which their impartiality or the appearance of their impartiality might reasonably be questioned . . . ." Code of Jud. Conduct canon 3.17(B). "The Judiciary . . . earns

---

[18] S.D. v. M.J.R., 415 N.J. Super. 417 (App. Div. 2010).

the public's confidence through acts of unquestioned integrity. When that trust is shaken[,] . . . our system of justice falters." DeNike v. Cupo, 196 N.J. 502, 506 (2008). To avoid that outcome, "judges must avoid acting in a biased way or in a manner that may be perceived as partial." Id. at 514 (emphasis omitted). See also Code of Jud. Conduct canon 2.1 (cautioning that "[a] judge shall act at all times in a manner that promotes public confidence in the . . . integrity and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety").

"Rule 1:18 obligates every judge to abide by the Rules of Professional Conduct and the Code of Judicial Conduct." DeNike, 196 N.J. at 515. Rule 1:12-1(g) directs judges not to sit in any matter "when there is any . . . reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." The standard for determining whether judicial disqualification is proper is: "Would a reasonable, fully informed person have doubts about the judge's impartiality?" DeNike, 196 N.J. at 517. That said, a judge may not "use disqualification to avoid cases that present difficult, controversial[,] or unpopular issues." Code of Jud. Conduct canon 3.17 cmt. 1. "[U]nwarranted disqualification may bring public disfavor to the court and to the judge personally." Ibid. Still, "[t]he disqualification

decision is initially left to the discretion of the trial court." State v. Marshall, 148 N.J. 89, 275-76 (1997).

In DeNike, "a lawyer approached a trial judge and asked if he would consider affiliating with the attorney's firm upon retirement. In response, the judge began preliminary negotiations with the lawyer. Throughout the brief period of their discussions, the lawyer was handling a contested, pending matter before the judge." Id. at 506. In assessing whether the standard was met for determining whether judicial disqualification was required, the Court focused on whether "an objective observer might reasonably wonder whether [the trial judge] favored the . . . firm either consciously or unconsciously." Id. at 517. Among other things, the Court determined "based on the timing of the negotiations toward the close of the case, an objective observer might reasonably wonder whether [the trial judge] favored the . . . firm." Ibid. Thus, the "employment discussions . . . created an appearance of impropriety that required disqualification." Id. at 518.

Here, the judge disqualified herself because she recognized one of defendant's prospective witnesses as a prior client. The witness, J.M., was defendant's mother but was not a party to the case. The judge had represented J.M. about twenty years prior in connection with an automobile accident. Before

recalling the prior representation, the judge had conducted a N.J.R.E. 104 hearing and had precluded J.M.'s testimony as inadmissible hearsay. Once the judge disclosed the scope of the prior relationship, neither party objected to the judge continuing in the case.

Applying the standard articulated by the DeNike Court, we conclude the judge erred in disqualifying herself. An "objective observer" would not reasonably wonder whether the judge would have favored one side or the other "either consciously or unconsciously." Id. at 517. First, the representation occurred two decades earlier. Indeed, neither the judge nor J.M. initially recognized each other. Second, J.M.'s testimony had already been ruled inadmissible. Thus, J.M. was not even a witness in the case. Third, both parties were satisfied the prior representation did not create a conflict or present impartiality issues and agreed to the judge continuing in the case. Under these circumstances, disqualification was unwarranted.

In explaining the disqualification decision, the judge reasoned that "[t]he facts and issues in this case [were] extremely sensitive and the court shall err on the side of caution because . . . there could be reasonable question on impartiality or the appearance of impartiality by either party once a decision is rendered" (emphasis added). We have stressed "[j]udges may not 'err on the side of caution

26

and recuse themselves unless there is a true basis that requires disqualification.'" Goldfarb v. Solimine, 460 N.J. Super. 22, 31 (App. Div. 2019) (quoting Johnson v. Johnson, 204 N.J. 529, 551 (2010) (Rabner, C.J., concurring)), modified in part by 245 N.J. 326 (2021). "A judge's duty to sit where appropriate is as strong as the duty to disqualify oneself where sitting is inappropriate." Ibid. (citing Johnson, 204 N.J. at 551 (Rabner, C.J., concurring)). Absent a true basis for disqualification, "judges have an obligation both to hear and vote on cases." Johnson, 204 N.J. at 551 (Rabner, C.J., concurring).

Plaintiff argues the judge's disqualification infused the hearing with error. She asserts "the mid-proceeding judge substitution affected the court's credibility assessments, as the second . . . [j]udge formed initial impressions of the witnesses and the case based on audio recordings and did not have the opportunity to observe the demeanor of [p]laintiff and [I.P.] during their direct testimony." According to plaintiff, the judge should have "restart[ed] the trial, as requested," instead of "resum[ing] mid-trial." Plaintiff contends "[g]iven the significance of the trial court's credibility assessments to the denial of the FRO," the "matter should be remanded and heard before a new judge."

When considering a trial judge's decision following an FRO hearing, "[o]ur scope of review is limited." C.C. v. J.A.H., 463 N.J. Super. 419, 428

27

(App. Div. 2020). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases" and have expertise in family matters. Ibid. "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). "We defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412).

Ordinarily,

> [w]e will "not disturb the 'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice.'" S.D. v. M.J.R., 415 N.J. Super. 417, 429 (App. Div. 2010) (quoting Cesare, 154 N.J. at 412). Despite our deferential standard, a judge's purely legal decisions are subject to our de novo review. Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007).
>
> [C.C., 463 N.J. Super. at 428-29 (second alteration in original) (citations reformatted).]

In <u>J.D. v. A.M.W.</u>, 475 N.J. Super. 306 (App. Div. 2023), we recited the well-settled analytic framework for evaluating domestic violence cases:

> In adjudicating a domestic violence case, the trial judge has a "two-fold" task. <u>Silver v. Silver</u>, 387 N.J. Super. 112, 125 (2006). The judge must first determine whether the plaintiff has proven, by a preponderance of the evidence, that the defendant committed one of the predicate acts referenced in N.J.S.A. 2C:25-19(a). If a predicate offense is proven, the judge must then assess "whether a restraining order is necessary, upon an evaluation of the [factors] set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." <u>J.D. v. M.D.F.</u>, 207 N.J. 458, 475-76 (2011) (quoting <u>Silver</u>, 387 N.J. Super. at 126-27). The factors which the court should consider include, but are not limited to:
>
> > (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment[,] and physical abuse;
> >
> > (2) The existence of immediate danger to person or property;
> >
> > (3) The financial circumstances of the plaintiff and defendant;
> >
> > (4) The best interests of the victim and any child;
> >
> > (5) In determining custody and parenting time the protection of the victim's safety; and

29

(6) The existence of a verifiable order of
protection from another jurisdiction.

[N.J.S.A. 2C:25-29(a).]

[J.D., 475 N.J. Super. at 313-14 (all but fourth
alteration in original) (citations reformatted).]

Plaintiff argues the judge erroneously determined the evidence was in equipoise because the judge made evidentiary errors that tainted her credibility assessments. Plaintiff asserts that, but for those errors, plaintiff would have proven by a preponderance of the evidence the predicate acts of sexual assault and contempt had occurred. Among other errors, plaintiff argues the judge improperly excluded I.P.'s testimony.

Although the judge correctly determined the admissibility of I.P.'s testimony about being sexually assaulted by defendant was governed by N.J.R.E. 404(b), the judge excluded the testimony summarily without conducting a proper Cofield analysis to determine whether the testimony was nonetheless admissible. We agree with plaintiff the judge should have performed a thorough N.J.R.E. 404(b) analysis as spelled out in Cofield.

N.J.R.E. 404(b)

> provides that ["e]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith." That Rule, however, goes on to

explain that "[s]uch evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." Thus, unless relevant under one of the exceptions of Rule 404(b), the prior bad acts or other-crimes evidence is simply inadmissible.

[State v. Lykes, 192 N.J. 519, 534 (2007) (alterations in original).]

In State v. Williams, 190 N.J. 114 (2007), our Supreme Court reaffirmed the Cofield paradigm by which prior bad acts or other-crimes evidence is to be analyzed. The Court explained:

In State v. Cofield, 127 N.J. 328, 338 (1992), this Court framed a four-pronged test to determine whether to admit other-crimes evidence for a permitted purpose under N.J.R.E. 404(b). The Cofield test requires that:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[Ibid.]

[Williams, 190 N.J. at 122 (citation reformatted).]

31

"Williams, however, makes clear that '[t]he requirement set forth as prong two of Cofield . . . is not one that can be found in the language of Evidence Rule 404(b)[, and] Cofield's second prong, therefore, need not receive universal application in Rule 404(b) disputes." Lykes, 192 N.J. at 535 (alterations and omission in original) (quoting Williams, 190 N.J. at 131).

"[T]he decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010) (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)). Therefore, we review a trial court's "[e]videntiary decisions . . . under [an] abuse of discretion standard." Ibid. "However, '[w]hen the trial court fails to apply the proper test in analyzing the admissibility of proffered evidence,' our review is de novo." Konop v. Rosen, 425 N.J. Super. 391, 401 (App. Div. 2012) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 4.6 on R. 2:10-2 (2012)); see also State v. Darby, 174 N.J. 509, 518 (2002) (applying de novo review when the trial court failed to properly analyze N.J.R.E. 404(b) evidence).

Here, the judge determined I.P.'s testimony "[wa]s offered solely to establish . . . [defendant]'s propensity or predisposition" and "that the probative value of . . . [I.P.]'s testimony [wa]s outweighed by its prejudicial value." Because we are persuaded the judge failed to properly analyze N.J.R.E. 404(b)

32

evidence, we review de novo. Beginning with the first Cofield prong, I.P.'s testimony was relevant to show opportunity, among other things, which was relevant to a material issue in dispute, namely, whether defendant had the opportunity to commit the sexual assaults undetected when others were present in the house.

In State v. Oliver, 133 N.J. 141, 145 (1933), the defendant "was convicted of sexually assaulting two women." "Each assault involved . . . the attacker lur[ing] the victims into his third-floor room while other family members were downstairs." Ibid. "The State proffered the testimony of three other women . . . who claimed to have been sexually assaulted by [the] defendant in a similar manner" in that "all the attacks had occurred while other people occupied the house." Id. at 148.

We reversed the convictions based on an inadequate and an omitted jury instruction. Id. at 145. In affirming this court's decision, our Supreme Court commented:

> [A]s the Appellate Division noted, the other-crime evidence would be admissible to show the feasibility of the proposition that [the] defendant could sexually assault women in his room without other household members hearing or seeing anything unusual. That question was clearly a genuine issue in the case, inasmuch as the defense introduced the testimony of various household members that they had not heard any

fighting or screaming on the evenings of the alleged assaults.

[Id. at 153.]

In affirming the defendant's aggravated sexual assault and related convictions, we reached a similar conclusion about the admissibility of other-crimes evidence in State v. Krivacska, 341 N.J. Super. 1, 11 (App. Div. 2001). There,

> [t]he offenses were allegedly committed in [the] defendant's office which was situated in a public area of the school. The defense presented numerous witnesses who testified with respect to the accessibility of that office and the ability of those traveling the hallway to have an unobscured view into the room. The feasibility of [the] defendant committing the offenses was one of the critical factual issues.
>
> [Id. at 41.]

Likewise, here, defendant's son testified the assaults could not have occurred without someone noticing. Defendant insisted the house was always full of family and friends who would sleep over. In her decision, the judge stated she "struggle[d]" with the fact that the sexual assaults allegedly occurred with ten people in the house. If sufficiently credible, I.P.'s testimony about defendant sexually assaulting her in a similar manner illustrated it was feasible for defendant to sexually assault plaintiff while others were present in the house.

Thus, the first <u>Cofield</u> prong was satisfied because opportunity was clearly a critical factual issue in the case.

Although not required, the second <u>Cofield</u> prong was likely satisfied because I.P. and plaintiff gave similar accounts of being sexually assaulted by defendant during the time they all lived together. Turning to the third <u>Cofield</u> prong, which requires proof of the other-crimes evidence by clear and convincing evidence,

> [c]lear and convincing "evidence is that which 'produce[s] in the mind of the trier of the fact a firm belief or conviction as to the truth of the allegations sought to be established,' evidence 'so clear, direct[,] and weighty and convincing as to enable (the factfinder) to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'"
>
> [<u>State v. Hernandez</u>, 170 N.J. 106, 127 (2001) (second alteration in original) (quoting <u>In re Samay</u>, 166 N.J. 25, 30 (2001)).]

"The clear and convincing standard may be satisfied by uncorroborated testimonial evidence." <u>Ibid.</u> (quoting <u>In re Samay</u>, 166 N.J. at 30).

Here, the judge did not make any credibility assessments regarding I.P.'s testimony. However, a factfinder could have found her testimony met the clear and convincing standard of proof given the details she provided and the fact that

35

she had filed a police report. Moreover, the testimony was corroborated by plaintiff's allegations.

Turning to the final <u>Cofield</u> prong, we acknowledge the judge found without elaboration the probative value of I.P.'s testimony was "outweighed by its prejudicial value." However, the judge never analyzed the permissible uses for I.P.'s testimony. Further, the judge failed to consider that when analyzing the fourth prong of the <u>Cofield</u> test in a bench trial, "[a] judge, trained and experienced in using evidence only for its proper purposes, and charged with protecting the rights and interests of all parties, is much less likely to be prejudiced against a defendant by reaching a conclusion that the defendant is simply a person of bad character." <u>N.J. Div. of Youth & Fam. Servs. v. I.H.C.</u>, 415 N.J. Super. 551, 576 (App. Div. 2010) (citing <u>State v. Kern</u>, 325 N.J. Super. 435, 444 (App. Div. 1999)).

Based on our de novo review of the <u>Cofield</u> prongs, we are convinced the judge erred in excluding I.P.'s testimony regarding being sexually assaulted by defendant without properly assessing its admissibility. Because the judge determined the evidence was in equipoise after excluding I.P.'s testimony, we believe the error "is of such a nature as to have been clearly capable of producing an unjust result." <u>R.</u> 2:10-2. We conclude the improper disqualification and

N.J.R.E. 404(b) ruling "gave rise to cumulative error warranting a new trial." Torres v. Pabon, 225 N.J. 167, 174 (2016). Accordingly, we reverse and remand to the trial court for a new FRO hearing before a different judge. See R.L. v. Voytac, 199 N.J. 285, 306 (2009) (holding when a "trial court previously made credibility findings, [it is] deem[ed] . . . appropriate that the matter be assigned to a different trial court"). In the new hearing, the judge should conduct a proper N.J.R.E. 404(b) analysis to determine the admissibility of I.P.'s testimony. We also reinstate the TRO pending conclusion of the FRO hearing. Based on our decision, we need not address plaintiff's remaining arguments.

Reversed and remanded for a new FRO hearing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

37

A-3119-23